# IN THE SUPREME COURT OF TEXAS

No. 13-0711

JAW The Pointe, L.L.C., Petitioner,

v.

Lexington Insurance Company, Respondent

On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas

**Argued January 13, 2015**

Justice Boyd delivered the opinion of the Court.

This insurance dispute involves losses the insured incurred as a result of city ordinances triggered by damage to an apartment complex during Hurricane Ike. The insurance policy covers the costs of complying with city ordinances, but only if the policy covers the property damage that triggers the enforcement of the ordinances. Here, the property damage that triggered the ordinances resulted from both wind, which the policy covers, and flooding, which the policy expressly excludes. The policy's anti-concurrent-causation clause excludes coverage "for loss or damage caused directly or indirectly by" flooding, "regardless of any other cause or event that contributes concurrently or in any sequence to the loss." Because the evidence conclusively establishes that flood damage triggered the enforcement of the city ordinances and thus "directly or indirectly" caused the insured's losses, we conclude the policy excludes coverage for such losses regardless of the fact that wind damage "contribute[d] concurrently or in any sequence to the loss." We agree with the court of appeals that the policy did not cover the insured's losses and thus the insured

cannot recover for the insurer's bad faith failure to effectuate a prompt and fair settlement of the claim. We affirm.

## I.
## Background

In July 2007, JAW The Pointe, L.L.C. purchased an apartment complex in Galveston, Texas for approximately $5.7 million. Fourteen months later, Hurricane Ike struck the Island and caused substantial damage to The Pointe apartments. JAW had obtained insurance to cover the property through Nations Asset Management L.P., which managed the insurance needs of 300 otherwise unrelated apartment complexes worth a total of approximately $2.5 billion. Nations purchased several policies providing multiple layers of coverage for all of the complexes collectively, with a total limit of $100 million per occurrence. Lexington Insurance Company provided the primary coverage layer, limited to $25 million per occurrence. Hurricane Ike damaged about 135 other complexes also covered by Lexington's policy.

Shortly after the hurricane struck, JAW submitted a sworn proof of loss to Lexington requesting an advance of $300,000 to help cover its ongoing business income losses. JAW initially planned to repair The Pointe apartments, but its plans changed when one of its partners, Emery Jakab, attended a meeting at which a City of Galveston official explained that city ordinances required that all apartment complexes that were "substantially damaged"—meaning they sustained damage equal to or exceeding 50% of their market value—must be brought into compliance with current code requirements, which included raising the structures to a base flood elevation. JAW concluded that it could not raise The Pointe without demolishing and rebuilding the complex. After the meeting, JAW sent an email to the city's planning office, explaining that JAW intended to

2

apply for a permit to repair The Pointe apartments but the damage estimates were "far in excess" of 50% of the complex's market value. JAW requested that the city confirm whether it would deny the permit for repairs and instead require JAW to elevate the apartments.

Two months after the hurricane, JAW submitted a permit application to the city and included a third-party consultant's estimate that it would cost $6,256,887 to repair all of the damage The Pointe had sustained. The estimate made no effort to distinguish between damage caused by wind and damage caused by flooding. The following day, Lexington's claims examiner noted in JAW's claim file that JAW's losses could reach The Pointe's total insured value of $8 million if the city required JAW to demolish and rebuild the apartments. The day after that, Lexington paid JAW the $300,000 JAW had requested as an advance against its business income losses.

In December 2008, Lexington's adjuster, Cunningham Lindsey, provided Lexington with a report confirming the magnitude of the damage at The Pointe and indicated that JAW would have to demolish and rebuild the complex to elevate the structure. That same month, the city sent a letter to JAW stating that the city had conducted a "substantial damage" determination[1] and concluded that the total damage "equals or exceeds 50 percent of the market value" of $2,247,924, which the city calculated by using the most recent appraised value and adding five percent. According to the city, because JAW's permit application accurately indicated that The Pointe was

---

[1] The city issued a public notice explaining that it would review permit applications to determine if they represented "appropriate values consistent with standard repair costs in our area." If the city determined that "the permits for a property exceed 50 percent of the building's appraised value, the property must be brought into conformance with the city's current floodplain requirements," which included raising the structure to a "minimum base flood elevation."

3

"substantially damaged," city ordinances required JAW to elevate the apartments three additional feet. In concluding that The Pointe was "substantially damaged," the city did not segregate the wind damage from the flood damage.

JAW informed Cunningham Lindsey of the city's determination, and Lexington's examiner received a copy of the city's letter in January 2009. Confirming that it was impossible to elevate the existing structures, JAW hired an architect and a contractor and began the demolition process. In February 2009, JAW submitted a formal claim to Cunningham Lindsey, requesting coverage for all demolition costs, construction costs, architectural and permitting fees, and other expenses that JAW had incurred and would incur to demolish and rebuild the apartments.

In April 2009, Lexington's building consultant, Unified Building Sciences, submitted a report to Lexington estimating that The Pointe had sustained wind damage totaling approximately $1,278,000 and flood damage of approximately $3.5 million. On May 5, 2009, after JAW's adjuster agreed with these estimates, JAW submitted a sworn proof of loss to Lexington, requesting payment of $817,940.94, which represented the $1,278,000 in wind damage less an applicable deductible. Lexington promptly paid this claim, but did not pay the additional amounts JAW had claimed as costs incurred to demolish and rebuild The Pointe pursuant to the city's ordinances. According to JAW, Lexington never formally denied JAW's claims for these ordinance-compliance losses. Instead, in July 2009, Cunningham Lindsey informed JAW's adjuster by telephone that Lexington had determined the policy did not cover the losses JAW incurred to comply with the city ordinances because "all the damages were caused by flood."

JAW sued Lexington, Cunningham Lindsey, and others on July 19, 2009, asserting claims for breach of the insurance contract and violations of the Texas Insurance Code and the Texas

4

Deceptive Trade Practices Act (DTPA). Despite the lawsuit, Lexington and Cunningham Lindsey continued working on JAW's claim. In September 2009, Lexington notified JAW by letter that it would not pay JAW for flood damage or for its costs to comply with the city ordinances. Meanwhile, Lexington continued paying claims associated with the other apartment complexes that its policy covered, and in January 2010 it notified JAW that the policy's $25 million per-occurrence limit had been exhausted.

After settling and dismissing all of its claims against Cunningham Lindsey, the excess insurance carriers, and others,[2] JAW continued to pursue its claims against Lexington. In March 2011, Lexington filed two motions for partial summary judgment, one seeking dismissal of JAW's breach of contract claim on the ground that Lexington had exhausted the policy limits, and the other seeking dismissal of any claims based on flood damage on the ground that the policy expressly excluded coverage for such damage. JAW did not oppose these motions, and the trial court granted them, leaving only JAW's statutory claims for trial. On those claims, the jury returned a verdict in JAW's favor, finding that Lexington had engaged in "unfair or deceptive acts or practices in the business of insurance" by failing to (a) "attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim when the insurer's liability had become reasonably clear"; (b) provide a reasonable explanation for its coverage denial; and (c) affirm or

---

[2] The record reflects that, by the time of trial, JAW had received about $5.7 million from these settlements, plus a combined total of $4.8 million in insurance proceeds from Lexington ($1.1 million), one of the excess insurers ($500,000), and its flood insurance carrier ($3.2 million). Lexington has argued that the total of over $10 million that JAW has already received for The Pointe's damages greatly exceeds both The Pointe's value and all of JAW's damages claims. In light of our holding that the policy does not cover JAW's ordinance-compliance losses, we need not address the effect of these settlement payments.

deny coverage within a reasonable time,[3] and that Lexington had engaged in this conduct "knowingly." The jury found that Lexington's conduct caused JAW to incur actual damages and expenses of $1,230,000 and awarded additional statutory damages of $2.5 million. Based on the jury's verdict, the trial court entered a judgment awarding these damages plus $170,000 in attorney's fees.

The court of appeals reversed and rendered a take-nothing judgment against JAW, concluding that the policy excluded coverage for JAW's code-compliance losses and therefore Lexington could not be liable for Insurance Code and DTPA violations. Relying on the policy's anti-concurrent-causation clause, the court of appeals held that the policy excluded coverage of JAW's costs to comply with the city's ordinances because the necessity of compliance resulted at least in part from flooding, coverage for which the policy expressly excluded.

## II.
## Coverage

As we have mentioned, the trial court granted summary judgment for Lexington on JAW's breach of contract claim but awarded JAW both its actual ordinance-compliance damages and additional statutory damages based on Lexington's "bad faith" statutory violations. We have held that, "[a]s a general rule there can be no claim for bad faith when an insurer has promptly denied a claim that is in fact not covered." *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex. 1995).[4]

---

[3] The jury also found that Lexington did not refuse to pay claims without conducting a reasonable investigation and did not compel JAW to file suit to recover "amounts due under their policy by offering substantially less than" the amounts owed. JAW did not contest these findings in Lexington's favor.

[4] *See also Chrysler Ins. Co. v. Greenspoint Dodge of Houst., Inc.*, 297 S.W.3d 248, 253–54 (Tex. 2009) (per curiam) (holding that, because the insurer "did not breach the insurance contract, no basis supports" awards for punitive and extra-contractual damages); *Progressive Cnty. Mut. Ins. Co. v. Boyd*, 177 S.W.3d 919, 922 (Tex. 2005)

6

Although "[w]e have left open the possibility that an insurer's denial of a claim it was not obliged to pay might nevertheless be in bad faith if its conduct was extreme and produced damages unrelated to and independent of the policy claim," *Boyd*, 177 S.W.3d at 922, JAW does not allege such extreme conduct or seek such independent damages in this case. Instead, JAW contends that the policy covered its ordinance-compliance costs and Lexington should have paid those costs before it made other payments that exhausted the policy limits. We must decide whether the policy in fact provided coverage for those costs.

## A.    Rules of Construction

In determining a question of insurance coverage, we look first to "the language of the policy because we presume parties intend what the words of their contract say." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). We give the policy's terms "their ordinary and generally-accepted meaning unless the policy shows the words were meant in a technical or different sense." *Id.* Since insurance policies are contracts, we construe them "according to general rules of contract construction to ascertain the parties' intent." *Id*. "We examine the entire agreement and seek to harmonize and give effect to all provisions so that none will be meaningless." *Id*.[5]

---

(per curiam) ("There can be no liability under article 21.55 if the insurance claim is not covered by the policy."); *Liberty Nat. Fire Ins. Co. v. Akin*, 927 S.W.2d 627, 629 (Tex. 1996) ("[I]n most circumstances, an insured may not prevail on a bad faith claim without first showing that the insurer breached the contract.").

[5] The policy at issue here is a standard form policy developed by ISO Commercial Risk Services, Inc. We strive to construe standard policies in a manner that is consistent with other states' constructions, to promote uniformity and predictability so that these policies' meaning will "be the same in Texas as in other states." *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 5 (Tex. 2007). However, except for one of the federal cases discussing anti-concurrent-causation clauses, the parties have not cited and we have not found any cases from other jurisdictions addressing the specific issues presented here.

"Terms in insurance policies that are subject to more than one reasonable construction are interpreted in favor of coverage." *Id.* at 133; *see also State Farm Life Ins. Co. v. Beaston*, 907 S.W.2d 430, 433 (Tex. 1995) ("Only if an insurance policy remains ambiguous despite these canons of interpretation should courts construe its language against the insurer in a manner that favors coverage."). "But an ambiguity does not exist simply because the parties interpret a policy differently." *Gilbert*, 327 S.W.3d at 133 (citing *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003)). "If a contract as written can be given a clear and definite legal meaning, then it is not ambiguous as a matter of law." *Id.* (citing *Progressive Cnty. Mut. Ins. Co. v. Sink*, 107 S.W.3d 547, 551 (Tex. 2003)).

## B. Burdens of Proof

"Initially, the insured has the burden of establishing coverage under the terms of the policy." *Id.* at 124 (citing *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 782 (Tex. 2008)). To avoid liability, the insurer then has the burden to plead and prove that the loss falls within an exclusion to the policy's coverage. *Id.*; *see also* TEX. INS. CODE § 554.002 ("In a suit to recover under an insurance . . . contract, the insurer . . . has the burden of proof as to any avoidance or affirmative defense that the Texas Rules of Civil Procedure require to be affirmatively pleaded. Language of exclusion in the contract . . . constitutes an avoidance or an affirmative defense."); TEX. R. CIV P. 94 ("Where the suit is on an insurance contract which insures against certain general hazards, but contains other provisions limiting such general liability, the party suing on such contract shall never be required to allege that the loss was not due to a risk or cause coming within any of the exceptions specified in the contract, nor shall the insurer be allowed to raise such issue unless it shall specifically allege that the loss was due to a risk or cause coming within a particular

8

exception to the general liability . . . .”). “If the insurer proves that an exclusion applies, the burden shifts back to the insured to show that an exception to the exclusion brings the claim back within coverage.” *Gilbert*, 327 S.W.3d at 124.

**C.     The Policy's Provisions**

Several provisions of Lexington's policy are relevant to the coverage question in this case. In the policy's Building and Personal Property Coverage Form, Lexington agreed to “pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.” The form's section that addresses “Covered Causes of Loss” refers to the “applicable Causes of Loss Form as shown in the Declarations.” Section A of the attached “Causes of Loss – Special Form,” which addresses “covered causes of loss,” provides as follows:

> A. COVERED CAUSES OF LOSS
>
> When Special is shown in the Declarations, Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the loss is:
>
> 1.  Excluded in Section B., Exclusions; or
>
> 2.  Limited in Section C., Limitations; that follow. [6]

The parties agree that, under this language, the policy is an “all-risks” policy, meaning it generally covers any “physical loss or damage to Covered Property at the premises,” no matter

---

[6] JAW argues that this Causes of Loss – Special Form is not a part of the Lexington policy because it is not specifically listed and therefore “shown in the Declarations.” The Declarations page, however, refers to all “Forms Attached: See attached forms schedule,” and the attached forms schedule includes the “Causes of Loss – Special Form.” We agree with the court of appeals that the Causes of Loss – Special Form is part of the policy and defines the “covered causes of loss” and “exclusions,” even though the Declarations section of the policy does not include the word “Special.”

9

what causes that loss or damage, *unless* the policy specifically excludes or limits coverage for losses resulting from a specific cause. *See, e.g.*, *SMI Realty Mgmt. Corp. v. Underwriters at Lloyd's, London*, 179 S.W.3d 619, 627 n.3 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("As a general rule, an all-risks policy creates a special type of coverage in which the insurer undertakes the risk for all losses of a fortuitous nature that, in the absence of the insured's fraud or other intentional misconduct, is not expressly excluded in the agreement."). The Building and Personal Property Coverage Form's section that addresses "Exclusions" also refers to the "applicable Causes of Loss Form as shown in the Declarations." Section B of the Causes of Loss – Special Form, in turn, lists the policy's exclusions:

> B. EXCLUSIONS
>
> 1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
>
>    a. Ordinance or Law
>
>    The enforcement of any ordinance or law:
>
>    1) Regulating the construction, use or repair of any property; or
>
>    2) Requiring the tearing down of any property, including the cost of removing its debris.
>
>    * * *
>
>    g. Water
>
>    1) Flood . . . .

This list of exclusions contains several provisions that are relevant to JAW's claim in this case. First, section B.1 expressly excludes coverage for any "loss or damage caused directly or

10

indirectly by any of the" listed causes, "regardless of any other cause or event that contributes concurrently or in any sequence to the loss." This is the anti-concurrent-causation clause at the center of the parties' dispute. Second, section B.1.g(1) specifically lists "Flood" as an excluded cause, and the parties agree that the policy does not cover losses caused by flooding. And third, section B.1.a. specifically lists "Ordinance or Law" as an excluded cause, meaning the policy expressly excludes coverage for any losses that result "directly or indirectly" from "[t]he enforcement of any ordinance or law."

As to the exclusion of "ordinance or law" losses, however, the policy also includes two endorsements that the parties agree provide coverage for such losses, despite the exclusion.[7] First, the policy includes an "Ordinance or Law Coverage" endorsement (O&L endorsement), which provides:

ORDINANCE OR LAW COVERAGE

This endorsement modifies insurance provided under the following:

BUILDING AND PERSONAL PROPERTY COVERAGE FORM

A. If a Covered Cause of Loss occurs to covered Building property, we will pay:

    1. For loss or damage caused by enforcement of any ordinance or law that:

        a. Requires the demolition of parts of the same property not damaged by a Covered Cause of Loss;

        b. Regulates the construction or repair of buildings, or establishes zoning or land use requirements at the described premises; and

---

[7] Generally, an endorsement or rider that provides specific coverage trumps an exclusion contained within the policy's primary forms. *See Drane v. Jefferson Standard Life Ins. Co.*, 161 S.W.2d 1057, 1062 (Tex. 1942) ("If there be a conflict between the policy and the rider, the latter controls, especially since its provisions are the more specific."). Lexington does not dispute that its policy's endorsements provide coverage for certain ordinance or law losses despite the exclusion expressed in the Causes of Loss – Special Form.

11

c. Is in force at the time of loss.

2. The increased cost to repair, rebuild or construct the property caused by enforcement of building, zoning or land use ordinance or law. If the property is repaired or rebuilt, it must be intended for similar occupancy as the current property, unless otherwise required by zoning or land use ordinance law.

3. The cost to demolish and clear the site of undamaged parts of the property caused by enforcement of the building, zoning or land use ordinance or law.

Second, the policy includes a "Demolition and Increased Cost of Construction" endorsement (DICC endorsement), which provides:

DEMOLITION AND INCREASED COST OF CONSTRUCTION

If at the time of any physical loss or damage insured against by this Policy there is in force any law or ordinance regulating the construction, repair, replacement or use of buildings or structures then this Policy shall cover as a result of enforcement of such law or ordinance as a direct result of such loss or damage:

a) the additional loss sustained in demolishing any physically undamaged portion of the buildings or structures;

b) the cost incurred in actually rebuilding both the physically damaged and demolished portions of such buildings or structures with materials and in a manner to satisfy such law or ordinance.

We must consider and harmonize all of these provisions to determine whether the policy covers the costs that JAW incurred to demolish and rebuild The Pointe.

D.   **The Anti-Concurrent-Causation Clause**

The court of appeals concluded that Lexington's policy does not cover JAW's ordinance-compliance costs because the property damage that caused the ordinances resulted at least in part from flooding, which is an excluded cause of loss. JAW contends that the court of appeals erred in this conclusion because: (1) JAW met its evidentiary burden by showing that the wind damage

12

was sufficient to be a "separate and independent" cause of its ordinance-compliance losses; (2) the court of appeals improperly shifted the burden of proof by requiring JAW to prove that the city segregated between wind damage and flood damage when it decided that The Pointe was "substantially damaged"; and (3) the anti-concurrent-causation clause does not apply when a covered peril (wind) is a "separate and independent cause" of the loss. Lexington responds that the O&L and DICC endorsements provide coverage for the costs of complying with city ordinances only when the policy covers the damage that triggers the ordinances' requirements. Because the damage that the city considered when it determined that The Pointe was "substantially damaged" included both covered wind damage and excluded flood damage, Lexington contends that the policy's anti-concurrent-causation clause excludes coverage for such damage and thus the O&L and DICC endorsements do not apply.

We look first to the language of the endorsements, which operate as coverage provisions in the policy. *Lamar Homes*, 242 S.W.3d at 14 ("[C]overage . . . depends, as it always has, on the policy's language, and thus is subject to change when the terms of the policy change."). The O&L and DICC endorsements modify the coverage provided under the policy's Building and Personal Property Coverage Form, which in turn covers any "direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss." A covered cause of loss is any "risk[ ] of direct physical loss," unless an exclusion applies. The court of appeals held that "[w]hen read together," the endorsements and Covered Cause of Loss form "provide that Lexington will pay for demolition and increased rebuilding costs that were caused by ordinance enforcement resulting from any 'Covered Cause of Loss.'" In other words, the court construed the

13

endorsements to apply (and thus provide coverage for ordinance-compliance costs) only if the enforcement of the ordinances was "based on damage caused by wind—a Covered Cause of Loss."

The parties agree that the O&L and DICC endorsements apply only if a covered loss causes the enforcement of the law or ordinance.[8] JAW contends, however, that because this is an all-risks policy, it merely had to show, and it in fact did show, that damage to the covered property caused the enforcement of the ordinances, and then the burden shifted to Lexington to show the damage that caused the enforcement of the ordinances was damage that the policy excluded. Here, JAW contends that the only evidence of what caused the city to enforce the ordinances against The Pointe is the permit application that JAW submitted to the city, estimating the total damages at $6,256,887, and the city's subsequent letter finding that The Pointe was "substantially damaged." Because neither of these communications establishes that the flood damage (for which the policy excluded coverage) caused the city to enforce the ordinances, JAW asserts that Lexington failed

---

[8] We note that, although the parties and the court of appeals treat the O&L and DICC endorsements the same in this respect, the endorsements' causation-related language is not in fact identical. The DICC endorsement provides coverage for losses incurred in demolishing and rebuilding performed "as a result of enforcement of [a] law or ordinance *as a direct result of* [a] loss or damage" that is "insured against by this Policy." (Emphasis added.) This endorsement thus requires that a covered loss cause the enforcement of the ordinance. The O&L endorsement, however, contains no similar language, and instead merely states that the policy covers demolition and construction costs "caused by" an ordinance "[i]f a Covered Cause of Loss occurs to covered Building property." It could thus be argued that the O&L endorsement requires that the enforcement of the ordinance cause the additional losses but does not require that covered losses cause the enforcement of the ordinance. *See, e.g.*, *Regents of Mercersburg Coll. v. Republic Franklin Ins. Co.*, 458 F.3d 159, 168 n.11 (3d Cir. 2006) (rejecting a similar argument); *Medical Plaza, LLC v. U.S. Fid. & Guar. Co.*, Civ No. 1:07cv98–LTS–RHW, 2008 WL 4335572, at *3, *6 (S.D. Miss. Sept. 17, 2008) (accepting a similar argument); *City of Elmira v. Selective Ins. Co. of N.Y.*, 83 A.D.3d 1262, 1264–65 (N.Y. App. Div. 2011) ("As the language makes clear, the only requirement necessary to trigger the Ordinance or Law provision is the occurrence of a 'Covered Cause of Loss' . . . . If defendant wished to limit its coverage to only those situations where the enforcement of an ordinance or law is caused by a covered loss, it could have easily done so through the language of the contract."). JAW does not make this argument, and instead agrees with Lexington that both the O&L endorsement and the DICC endorsement apply only if a covered loss causes the enforcement of the ordinance or law. We thus accept that construction of the endorsements for purposes of this case.

14

to meet its burden to show that the policy excluded coverage for JAW's resulting ordinance-compliance costs.

As explained below, however, the evidence conclusively established that the damage The Pointe sustained included both wind damage and flood damage, and that the city based its decision to enforce the ordinances on the combined total of the two. In light of this, Lexington contends that the policy's anti-concurrent-causation clause expressly excluded coverage for JAW's ordinance-compliance costs. The anti-concurrent-causation clause, which appears as an introduction to the policy's list of exclusions, provides that Lexington will not pay for any "loss or damage caused *directly or indirectly* by any" excluded cause or event, "regardless of any other cause or event that contributes concurrently or in any sequence to the loss." (Emphasis added.) Lexington contends that, because the loss for which JAW seeks coverage (its costs for complying with the city ordinances) resulted "directly or indirectly" from an excluded peril (flood), the policy excludes coverage even if a covered peril (wind) "contribute[d] concurrently or in any sequence to [that] loss."

We have not previously addressed an anti-concurrent-causation clause, but federal courts and lower courts of appeals have interpreted and upheld the applicability of virtually identical clauses under Texas law and other states' laws. *See, e.g.*, *ARM Props. Mgmt. Group v. RSUI Indem. Co.*, 400 F. App'x 938, 941 (5th Cir. 2010); *Leonard v. Nationwide Mut. Ins. Co.*, 499 F.3d 419, 429–31 (5th Cir. 2007) (interpreting Mississippi law); *Lexington Ins. Co. v. Unity/Waterford-Fair Oaks*, Ltd., No. CIV.A. 399CV1623D, 2002 WL 356756, at *4 (N.D. Tex. Mar. 5, 2002); *Wong v. Monticello Ins. Co.*, No. 04–02–00142–CV, 2003 WL 1522938, at *1 (Tex. App.—San Antonio Mar. 26, 2003, pet. denied). The Fifth Circuit in particular has had the opportunity to develop case

15

law on anti-concurrent-causation clauses in situations involving combinations of covered wind damage and excluded flood damage, and has concluded that "[t]he only species covered under [a policy with an anti-concurrent-causation clause] is damage caused *exclusively* by wind. But [when] wind and water synergistically cause[ ] the *same* damage, such damage is excluded." *Leonard*, 499 F.3d at 430; *see also ARM Props.*, 400 F. App'x at 941 (quoting same language).[9] We agree with the Fifth Circuit that, under Texas law, the anti-concurrent-causation clause and the exclusion for losses caused by flood, "read together, exclude from coverage any damage caused by a combination of wind and water." *Id.*

JAW contends that applying the anti-concurrent-causation clause in this manner conflicts with the common-law concurrent-causation doctrine that we have recognized under Texas law. Under this doctrine, we have held that, when "excluded and covered events combine to cause" a loss and "the two causes cannot be separated," concurrent causation exists and "the exclusion is triggered" such that the insurer has no duty to provide the requested coverage. *Utica Nat. Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 204 (Tex. 2004). But when a covered event and an excluded event "each independently cause" the loss, "separate and independent causation" exists, "and the insurer must provide coverage despite the exclusion." *Id.* (citing *Guar. Nat'l Ins. Co. v. North River Ins. Co.,* 909 F.2d 133, 137 (5th Cir. 1990); *Warrilow v. Norrell*, 791 S.W.2d 515, 526 (Tex. App.—Corpus Christi 1989, writ denied); *Cagle v. Commercial Standard Ins. Co.*, 427 S.W.2d 939, 943–44 (Tex. Civ. App.—Austin 1968, no writ)). JAW contends that the evidence

---

[9] We find no relevant, substantive difference between the anti-concurrent-causation clauses at issue in *ARM Prope*rties and *Leonard* and the one at issue here.

16

establishes that the covered wind damage to The Pointe was itself sufficient to constitute "substantial damage" under the city's standards and thus trigger enforcement of the ordinances, so the wind damage was a "separate and independent" cause that results in coverage.

However, we must evaluate JAW's claim in this case in light of the policy's anti-concurrent-causation clause, not the common-law concurrent-causation doctrine that we addressed in cases involving policies that did not include a similar clause. To determine coverage under the policy, we look first to "the language of the policy because we presume parties intend what the words of their contract say." *Gilbert*, 327 S.W.3d at 126. The clause included in Lexington's policy provides that Lexington will not pay for any loss resulting "directly or indirectly" from an excluded peril, regardless of whether a covered peril contributes "concurrently or in any sequence" to the loss. *See Leonard*, 499 F.3d at 430; *ARM Props.*, 400 F. App'x at 941. Under this language, if the covered wind damage and the excluded flood damage contributed to cause the enforcement of the city ordinances, then the policy excludes coverage.

JAW contends that, because the evidence includes estimates calculating the total of all wind damage to be greater than 50% of The Pointe's market value, the wind damage itself was sufficient to trigger the ordinances and require JAW to demolish and rebuild The Pointe. Under these facts, and the contractual anti-concurrent-causation clause, however, the relevant inquiry is what in fact triggered enforcement of the ordinances, not what in theory was sufficient to do so. Here, JAW does not seek to recover losses caused by wind damage—Lexington has already paid JAW for those losses—or losses caused by flood damage—JAW concedes that the policy excludes coverage for those losses. Instead, JAW seeks to recover losses caused by the city's enforcement

17

of the ordinances against The Pointe. The question, therefore, is what caused the city to enforce the ordinances.

We conclude that the evidence conclusively establishes that Hurricane Ike caused both wind damage and flood damage, in a sequence of events, which combined to cause the city to enforce the ordinances against The Pointe. Indeed, the evidence here established that:

(1) in October 2008, one month after Hurricane Ike struck, JAW sent an email to the city's planning office, stating that the damage estimates were "far in excess" of 50% of The Pointe's market value, and requesting that the city confirm whether it would require JAW to elevate the complex;

(2) in November 2008, two months after the hurricane, JAW submitted a permit application to the city with a repairs estimate of $6,256,887, which made no effort to distinguish between damage caused by wind and damage caused by flooding; and

(3) in December 2008, three months after the hurricane, the city notified JAW that the city had determined The Pointe was "substantially damaged" (in excess of fifty percent of the city-designated market value of $2,247,924) and that city ordinances required JAW to bring the complex into compliance with current building codes; like JAW's permit application estimate, this notice made no effort to segregate the damage that resulted from wind from the damage that resulted from flooding.

JAW's November 2008 permit application is critical here because the record shows that the city relied on information provided with permit applications to determine whether to enforce its ordinances against a particular property. Indeed, the city explained in a public notice that it would review permit applications to determine if they represented "appropriate values consistent with standard repair costs in our area." And if the city determined the *permit application* established that the damage exceeded 50% of the property's market value, the city would then enforce its ordinances against that property. Thus, JAW's permit application, which did not distinguish between the amount of wind damage and flood damage, but which nevertheless included a number that was far in excess of all wind damage estimates, meaning it must have

18

included flood damage, was the touchstone for the city's enforcement of the ordinances against The Pointe. The city's December 2008 notice simply advised JAW that it had determined that The Pointe was "substantially damaged," and made no distinction between the amounts of wind damage and flood damage that led the city to that conclusion. But because the city's procedures dictated that its determination would be based on JAW's permit application, the notice actually confirms that the city relied on the combined total of wind damage and flood damage in its decision to enforce the ordinances.

JAW notes that, in April 2009, Lexington's building consultant estimated that The Pointe had sustained wind damage totaling approximately $1,278,000, and that amount exceeded 50% of The Pointe's city-designated market value. JAW thus contends that the evidence supports the conclusion that the covered wind damage was independently sufficient to cause the enforcement of the city ordinances. But that estimate, made four months after the city had already decided to enforce the ordinances, is no evidence of what led to the city's determination. The only evidence of that fact is JAW's original email, JAW's permit application, and the city's notice letter, and that evidence conclusively establishes that the wind damage and the flood damage combined to cause the city to enforce the ordinances against The Pointe. We thus conclude that Lexington sustained its burden to prove that the policy's anti-concurrent-causation clause excluded coverage for the losses JAW incurred in complying with the city's ordinances.[10]

---

[10] Lexington asserted five alternative grounds for affirming the court of appeals' judgment. Like the court of appeals, we need not address those grounds in light of our decision that the policy does not cover JAW's losses.

19

### III.
### Conclusion

The parties agree in this case that Lexington's policy endorsements only covered losses that JAW incurred to comply with the city's ordinances if a covered loss caused the enforcement of those ordinances. Because the covered wind losses and excluded flood losses combined to cause the enforcement of the ordinances concurrently or in a sequence, we agree with the court of appeals that the policy's anti-concurrent-causation clause excluded coverage for JAW's losses, and JAW therefore cannot recover against Lexington on its statutory bad faith claims. We affirm the court of appeals' judgment.

                                              _____

                                              Jeffrey S. Boyd
                                              Justice

Opinion delivered:  April 24, 2015