**Affirmed and Memorandum Opinion filed March 31, 2020.**



**In The**

# Fourteenth Court of Appeals

## NO. 14-18-00828-CV

**UNI-PIXEL, INC., REED KILLION, AND JEFFREY TOMZ, Appellants**

**V.**

**XL SPECIALTY INSURANCE COMPANY, Appellee**

**On Appeal from the 55th District Court
Harris County, Texas
Trial Court Cause No. 2016-70515**

## M E M O R A N D U M   O P I N I O N

Appellants Uni-Pixel, Inc., Reed Killion, and Jeffrey Tomz (collectively, "Appellants") sued appellee XL Specialty Insurance Company, alleging XL wrongfully denied coverage under a directors and officers liability insurance policy that XL issued to Appellants. The trial court granted XL's summary judgment motion and Appellants appealed. For the reasons below, we affirm.

BACKGROUND

Uni-Pixel was a technology company that developed and sold display and touchscreen technologies for use in phones, tablets, and other electronic devices. Killion served as Uni-Pixel's chief executive officer and president; Tomz served as the company's chief financial officer and secretary. Uni-Pixel developed a product called UniBoss, a copper-mesh film that sits under the glass in touch screen devices. Uni-Pixel represented that UniBoss was cheaper, easier to manufacture, and more responsive than competing touch-sensor technologies.

In Uni-Pixel's press releases and other filings, Appellants touted the company's success with UniBoss and claimed that products containing the technology would be on store shelves in September 2013. But despite these reports of progress, UniBoss's commercialization was delayed and certain financial publications cast doubt on the veracity of Appellants' statements.

Uni-Pixel's shareholders sued Appellants in a class action lawsuit and a shareholder derivative suit; both actions alleged Appellants made false and misleading statements with respect to the commercialization of UniBoss. Appellants also were investigated by the United States Securities and Exchange Commission ("SEC"), which culminated in an enforcement action filed in March 2016.

Discussing these events in greater detail below, we rely on statements and allegations contained in the pleadings filed in the shareholder lawsuits and the SEC enforcement action, as well as other communications sent from the SEC to Appellants.

## I. Uni-Pixel and UniBoss

Uni-Pixel debuted UniBoss in 2010. On December 7, 2012, Uni-Pixel

issued a press release entitled, "Uni-Pixel and Major PC Maker Enter Multi-Million Dollar Preferred Price and Capacity License Agreement to Introduce Products with UniBoss-Based Touch Screens."  The press release announced that Uni-Pixel had partnered with a "manufacturer of personal computers" to commercialize products that contained UniBoss.  The press release did not name the manufacturer or disclose the terms of the agreement.  The press release was filed with the SEC but failed to comply with certain SEC rules requiring companies to disclose, among other things, the identity of the parties to the agreement and a brief description of the terms and conditions of the agreement.  *See* SEC, Final Rule: Additional Form 8-K Disclosure Requirements and Acceleration of Filing Date, Release Nos. 33-8400, 34-49424 (Mar. 16, 2004).

Uni-Pixel's license agreement with the unnamed computer manufacturer was reiterated in a February 2013 press release announcing the company's 2012 fourth-quarter financial results.  The February 2013 press release also stated Uni-Pixel would begin producing UniBoss in limited quantities in the second quarter of 2013, with a significant ramp up in the third quarter.  On the heels of these positive announcements, Uni-Pixel's stock rose significantly.  In March 2013, Killion and Tomz sold a large number of Uni-Pixel shares and acquired over $1.5 million in profits.

In April 2013, Uni-Pixel published two additional press releases.  The first announced that Uni-Pixel had "engaged a major touch-screen ecosystem partner to facilitate the development, introduction and production of products that feature next-generation touch screens based on Uni-Pixel's UniBoss pro-cap, multi-touch sensor film."  As with the December 2012 press release, Uni-Pixel did not disclose the name of the "ecosystem partner" or the terms of the agreement.  Uni-Pixel's second April 2013 press release announced a manufacturing and supply agreement

with Kodak.

Uni-Pixel's May 2013 press release addressed the license agreement with the unnamed computer manufacturer and stated that, although Uni-Pixel had anticipated that products containing UniBoss would be on store shelves in the third quarter of 2013, those products would not be available for sale until the fourth quarter. Uni-Pixel attributed the delay to difficulties the computer manufacturer was experiencing with its operating system.

At the end of May 2013, an article about Uni-Pixel and UniBoss was published by *Seeking Alpha*, a website reporting on financial markets. The article discussed the history of Uni-Pixel and UniBoss and interviewed several individuals who had tested the product. Concluding that "UniBoss does not work and will not be accepted by the market for a variety of reasons," the article asserted that "the end game is approaching and Uni-Pixel will again fail to deliver meaningful revenues from UniBoss." Uni-Pixel's stock price fell 23% on May 31, 2013.

## II. Shareholder Lawsuits, the SEC Formal Investigation, and the SEC Enforcement Action

Uni-Pixel's shareholders filed a class action lawsuit (the "Class Action") against Appellants in June 2013, alleging Appellants committed securities fraud by (1) misleading investors about UniBoss's commercial prospects for 2013; (2) using secrecy with respect to its license agreements; and (3) using unusual accounting to provide a veneer of progress.

On November 18, 2013, the SEC issued subpoenas to Killion, Tomz, and another Uni-Pixel employee, seeking testimony and documents for a securities investigation. The subpoenas requested the following documents:

    1.    Documents sufficient to identify the names of all entities referenced as or concerning a "partner," including but not limited to partners not

4

specifically identified by name or are referenced as an "undisclosed" entity, in [Uni-Pixel's] financial statements and other documents filed by [Uni-Pixel] with the Commission; and

2. any and all agreements, contracts, and/or purchase orders with the entities identified in Item 1 above that are specifically referenced or mentioned in [Uni-Pixel's] financial statements and other documents filed by [Uni-Pixel] with the Commission.

On November 19, 2013, the SEC mailed to Appellants' counsel a copy of the SEC's "Formal Order of Private Investigation" (together with the subpoenas, the "SEC Formal Investigation"). The formal order asserted that the SEC had "information that tends to show" the occurrence of the following violations:

- false statements of material fact concerning the viability and revenue potential of UniBoss;

- filing SEC forms that contained false statements of material fact;

- failure to keep books, records, and accounts that accurately reflected Uni-Pixel's transactions and its disposition of assets;

- failure to implement and maintain a system of internal accounting controls; and

- falsifying books, records, or accounts that Uni-Pixel was required to maintain.

While the SEC's Formal Investigation was ongoing, Uni-Pixel's shareholders filed a derivative action in February 2014 (the "Derivative Action"). The Derivative Action alleged that Appellants "repeatedly represented that UniBoss would be ready to be shipped to customers so that it would be incorporated into products that would appear on store shelves in September 2013," but Appellants "were unable to perfect the product or the production process such that it could be manufactured and shipped in commercial quantities within that timeframe."[1] The Derivative

---

[1] In addition to Killion and Tomz, the Derivative Action also asserted claims against nine other Uni-Pixel directors and officers.

Action asserted claims for breach of fiduciary duty, waste of corporate assets, misappropriation of information, unjust enrichment, and aiding and abetting.

In June 2015, the SEC sent "Wells Notices" to counsel for Killion and Tomz, stating that the SEC had "made a preliminary determination to recommend that the Commission file an enforcement action." "'A Wells Notice notifies the recipient that the SEC's Enforcement Division is close to recommending to the full Commission an action against the recipient and provides the recipient the opportunity to set forth his version of the law or facts.'" *S.E.C. v. Internet Sols. for Bus. Inc.*, 509 F.3d 1161, 1163 n.1 (9th Cir. 2007) (quoting *Carlson v. Xerox Corp.*, 392 F. Supp. 2d 267, 279 (D. Conn. 2005)). The SEC Enforcement Action was filed in March 2016 and alleged that Appellants (1) made materially misleading statements and omissions about Uni-Pixel's touch-screen manufacturing technologies and business prospects; (2) failed to disclose material terms of agreements Uni-Pixel entered into with major technology companies; and (3) repeatedly violated accounting standards.

III.    **The XL Insurance Policy**

XL issued to Uni-Pixel a directors and officers liability insurance policy for claims first made against the insureds for the period from April 1, 2015 through April 1, 2016 (the "XL Policy"). In July 2015, Appellants sought coverage under the XL Policy for the investigation initiated by the Wells Notices sent to Killion and Tomz. XL denied the requested coverage.

XL asserts that Appellants did not request coverage under the XL Policy for the SEC Enforcement Action. Appellants argue that, "by timely seeking coverage for the Wells notice, the insureds thereby also gave notice for the SEC enforcement action."

6

## IV.    Underlying Proceedings

Appellants sued XL in October 2016, alleging claims arising from XL's denial of insurance coverage with respect to the Wells Notices and the SEC Enforcement Action. The parties filed cross motions for summary judgment and Appellants dropped two of their claims, pursuing only their breach of contract action. In its traditional summary judgment motion, XL asserted that the Wells Notices and the SEC Enforcement Action did not fall within the scope of coverage under the XL Policy.

After a hearing, the trial court granted XL's traditional summary judgment motion and denied Appellants' motion. In its order granting XL's motion, the trial court stated that it "adopts all of the reasoning presented by [XL]." The trial court signed a final judgment on August 30, 2018. Appellants timely appealed.

### ANALYSIS

Asserting the trial court erred when it granted XL's traditional motion for summary judgment, Appellants argue the XL Policy provides coverage for losses associated with the Wells Notices and the SEC Enforcement Action. Appellants raise two issues and contend that (1) they established coverage under the terms of the XL Policy, and (2) XL cannot prove the losses fall within the Policy's exclusions.

In response, XL contends that the Wells Notices and the SEC Enforcement Action involve the same facts or series of related facts as the Class Action, the Derivative Suit, and the SEC Formal Investigation. Therefore, XL argues, Appellants cannot establish coverage under the XL Policy because losses associated with the Wells Notice and SEC Enforcement Action were not "Claims" first made during the applicable policy period.

7

We review *de novo* a trial court's order granting or denying cross motions for summary judgment. *Lane-Valente Indus. (Nat'l), Inc. v. J.P. Morgan Chase, N.A.*, 468 S.W.3d 200, 204 (Tex. App.—Houston [14th Dist.] 2015, no pet.). When both sides move for summary judgment and the trial court grants one motion and denies the other, we review both sides' summary judgment evidence to determine all questions presented. *Tobin v. Garcia*, 316 S.W.2d 396, 400 (Tex. 1958). The party moving for a traditional summary judgment must establish that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Tobin*, 316 S.W.2d at 400. When, as here, the trial court grants a traditional summary judgment motion without specifying the grounds on which it relies, we affirm if any of the grounds presented are meritorious. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872-73 (Tex. 2000); *Reule v. Colony Ins. Co.*, 407 S.W.3d 402, 405 (Tex. App.—Houston [14th Dist.] 2013, pet. denied).

"Texas courts generally interpret insurance policies under the same rules of construction that apply to other contracts, reading all parts of an insurance policy together and viewing the policy in its entirety to give effect to the written expression of the parties' intent." *Thompson v. Geico Ins. Agency, Inc.*, 527 S.W.3d 641, 643-44 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (citing *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 740-41 (Tex. 1998)). We apply the ordinary rules of contract construction to insurance policies and ascertain the parties' intent by looking only to the four corners of the policy. *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 747 (Tex. 2006); *Thompson*, 527 S.W.3d at 644. We aim to give effect to all of the policy's provisions so that none will be rendered meaningless. *See Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010).

If the policy language is so worded that it can be given a definite or certain legal meaning, the policy is not ambiguous and we construe it as a matter of law. *de Laurentis v. United Servs. Auto. Ass'n*, 162 S.W.3d 714, 721 (Tex. App.— Houston [14th Dist.] 2005, pet. denied) (op. on rehearing). "Ambiguity does not arise simply because the parties offer conflicting interpretations; rather, ambiguity exists only when the contract is susceptible of two or more reasonable interpretations." *Essex Ins. Co. v. Eldridge Land, L.L.C.*, 442 S.W.3d 366, 370 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

Initially, the insured bears the burden of establishing coverage under the terms of the policy. *JAW The Pointe, L.L.C. v. Lexington Ins. Co.*, 460 S.W.3d 597, 603 (Tex. 2015). If the insured makes this showing, the burden shifts to the insurer to plead and prove that the loss falls within an exclusion to the policy's coverage. *Id.*; *see also SWE Homes, LP v. Wellington Ins. Co.*, 436 S.W.3d 86, 90 (Tex. App.—Houston [14th Dist.] 2014, no pet.). "If the insurer proves that an exclusion applies, the burden shifts back to the insured to show that an exception to the exclusion brings the claim back within coverage." *Gilbert Tex. Constr., L.P.*, 327 S.W.3d at 124.

Here, our analysis begins with Appellants' contention that they established coverage under the terms of the XL Policy. *See JAW The Pointe, L.L.C.*, 460 S.W.3d at 603. The XL Policy provisions central to this analysis are not ambiguous and we construe their meaning as a matter of law. *See de Laurentis*, 162 S.W.3d at 721. The "Insuring Agreements" provision outlines XL's obligations to insure Appellants against certain losses:

(A)    The Insurer shall pay on behalf of the **Insured Persons**[2] **Loss**

---

2 The parties do not dispute that Killion and Tomz are included within the XL Policy's definition of "Insured Persons".

9

resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** or, if applicable, the Optional Extension Period, for a **Wrongful Act** or **Employment Practices Wrongful Act**, except for **Loss** which the **Company** is permitted or required to pay on behalf of the **Insured Persons** as indemnification.

(B)    The Insurer shall pay on behalf of the **Company Loss** which the **Company** is required or permitted to pay as indemnification to any of the **Insured Persons** resulting from a **Claim** first made against the **Insured Persons** during the **Policy Period** or, if applicable, the Optional Extension Period, for a **Wrongful Act** or **Employment Practices Wrongful Act**.

(C)    The Insurer shall pay on behalf of the **Company Loss** resulting solely from any **Securities Claim** first made against the **Company** during the **Policy Period** or, if applicable, the Optional Extension Period, for a **Company Wrongful Act**.

(emphasis in original).  As this portion of the XL Policy shows, XL was obligated to provide coverage to Appellants only with respect to "**Claim**[s] first made . . . during the **Policy Period**."  (emphasis in original).  The XL Policy Period began April 1, 2015 and concluded April 1, 2016.

The XL Policy defines "Claim" as follows:

(1)    a written demand for monetary or non-monetary relief;

(2)    any civil proceeding in a court of law or equity, or arbitration;

(3)    any criminal proceeding which is commenced by the return of an indictment;

(4)    a formal civil, criminal, administrative regulatory proceeding or formal investigation of an Insured Person or the Company (but with respect to the Company only for a Company Wrongful Act) which is commenced by the filing or issuance of a notice of charges, formal investigative order or similar document identifying in writing such Insured Person or the Company as a person or entity against whom a proceeding as described in (C)(2) or (3) above may be commenced, including any:

(a) "Wells" or other notice from the Securities and Exchange Commission or a similar state or foreign governmental authority

10

that describes actual or alleged violations of securities or other laws by such Insured Person; or

(b) proceeding before the Equal Employment Opportunity Commission or any similar federal, state or local governmental body having jurisdiction over any Employment Practices Wrongful Act;

(c) a subpoena served upon an Insured Person in connection with an investigation of the Company for a Company Wrongful Act by the Securities and Exchange Commission or any similar state, federal or foreign agency.

Under this definition, the separate proceedings underlying this action all constitute individual "Claims": the Class Action, the Derivative Suit, and the SEC Enforcement Action are "civil proceeding[s] in a court of law", and the SEC Formal Investigation and Wells Notices are "formal investigation[s] of an Insured Person or the Company".

Although the XL Policy's definition of "Claims" suggests that each of the underlying proceedings constitutes a separate "Claim", the terms of the Policy prevent considering these Claims in isolation. Rather, under the "General Conditions" section of the XL Policy, the "Interrelated Claims" provision states that "[a]ll **Claims** arising from the same **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** . . . ."[3] (emphasis in original). "Interrelated Wrongful Acts" are defined as:

[A]ny **Wrongful Act**, **Company Wrongful Act**, or **Employment**

---

[3] In their brief, Appellants assert the "Interrelated Claims" provision is an exclusion to coverage under the XL Policy. But this provision is not included under the portion of the XL Policy listing its "Exclusions"; instead, this provision falls under the Policy's "General Conditions." Therefore, we examine this provision with respect to Appellants' initial burden to establish coverage under the terms of the XL Policy. *See JAW The Pointe, L.L.C.*, 460 S.W.3d at 603; *see also Reeves Cty. v. Houston Cas. Co.*, 356 S.W.3d 664, 670 (Tex. App.—El Paso 2011, no pet.) (where insurance policy provision was a "condition" rather than an "exclusion", the insureds "bore the initial burden" to show the condition did not limit the scope of the policy's coverage with respect to their claimed losses).

11

**Practices Wrongful Act** based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any of the same or related facts, series of related facts, circumstances, situations, transactions or events.

(emphasis in original).  The XL Policy defines "Wrongful Act" to include "any actual or alleged act, error, omission, misstatement, misleading statement, neglect, or breach of duty".

Reading these provisions together, we conclude Appellants did not satisfy their burden to establish coverage under the XL Policy.  The Wells Notices and the SEC Enforcement Action are Claims that arose from the same "Interrelated Wrongful Acts" as the Class Action, the Derivative Suit, and the SEC Formal Investigation.  All of these Claims stem from the same wrongful acts arising out of the same series of related facts, namely, Appellants' statements and representations regarding UniBoss.  Therefore, losses associated with these Claims are subject to the "Interrelated Claims" condition and do not fall within the scope of the XL Policy's coverage.

The pleadings filed in the Class Action, the Derivative Lawsuit, and the SEC Enforcement Action all allege that Appellants made false statements of fact regarding (1) Uni-Pixel's ability to commercialize UniBoss; (2) the schedule for the production of UniBoss products and progress made with respect to that schedule; and (3) UniBoss's revenue potential.  These allegations are premised on the same underlying facts, including (1) Uni-Pixel's license agreement with the unnamed computer manufacturer; (2) Uni-Pixel's agreement with the unnamed "eco-system partner"; and (3) the Kodak agreement.

Likewise, the SEC's Formal Investigation also was premised on alleged false statements of fact regarding the viability and revenue potential of UniBoss.  The subpoenas sent to Killion and Tomz specifically requested documents

regarding "[a]ny and all agreements, contracts, and/or purchase orders" Uni-Pixel had executed with unnamed entities it identified as its "partners." The SEC's Formal Order identified several possible violations stemming from this series of transactions, including the failure to keep accurate books, records, and accounts and the failure to implement a system of accounting controls.

The pleadings in the Class Action, the Derivative Lawsuit, and the SEC Enforcement Action, as well as the documents sent to Appellants as part of the SEC Formal Investigation, also allege accounting irregularities and noncompliance with certain SEC regulations. These alleged wrongful acts are based on the same underlying facts discussed above, including Uni-Pixel's agreements regarding the commercialization of Uniboss, SEC filings made with respect to these agreements, and statements regarding these agreements' revenue potential.

Falling squarely within the "Interrelated Wrongful Acts" provision of the XL Policy, the SEC Enforcement Action arose from the same wrongful acts and the same series of facts. The Wells Notices — which precipitated and gave notice of the SEC Enforcement Action — therefore also arose from these wrongful acts and underlying facts. According to the terms of the XL Policy, these Claims constitute a single Claim that arose before the April 1, 2015 commencement of the XL Policy Period and are outside the scope of the XL Policy's coverage.

Focusing on the applicable standard of review, Appellants assert they "need only offer a pro-coverage reading of the insurance policy that is at least 'not unreasonable.'" But we defer to Appellants' interpretation only if the policy is susceptible to more than one reasonable interpretation. *See Nat'l Union Fire Ins. Co. of Pittsburgh v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991) ("If the written instrument is worded so that it can be given only one reasonable construction, it will be enforced as written. However, if a contract of insurance is

susceptible of more than one reasonable interpretation, we must resolve the uncertainty by adopting the construction that most favors the insured.") (internal citation omitted); *see also Gilbert Tex. Constr., L.P.*, 327 S.W.3d at 133 (same).

Here, the XL Policy is subject to only one reasonable interpretation. Given the "Interrelated Claims" provision and the Policy's broad definition of "Interrelated Wrongful Acts," it is clear that the Wells Notices and the SEC Enforcement Action constitute a single Claim that arose before the commencement of the XL Policy Period. Therefore, Appellants did not meet their burden to show the losses associated with the Wells Notices and the SEC Enforcement Action fall within the XL Policy's coverage. *See JAW The Pointe, L.L.C.*, 460 S.W.3d at 603. Because Appellants did not make this showing, we do not address their second issue regarding the XL Policy's exclusions. We overrule Appellants' two issues on appeal.

## CONCLUSION

We affirm the trial court's August 30, 2018 final judgment.


/s/     Meagan Hassan
       Justice


Panel consists of Justices Zimmerer, Spain, and Hassan.