**Affirm in part, reverse in part, and remand; Opinion Filed August 1, 2017.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-16-00108-CV

### CHARLES R. ALLEN AND JULIE L. ALLEN, Appellants
### V.
### STATE FARM LLOYDS, Appellee

**On Appeal from the County Court at Law No. 2**
**Dallas County, Texas**
**Trial Court Cause No. CC-12-02015-B**

## MEMORANDUM OPINION

Before Justices Francis, Myers, and Whitehill
Opinion by Justice Myers

This is a dispute about whether a State Farm Lloyds homeowners insurance policy provides coverage under the dwelling foundation and water damage endorsements for damages to Charles and Julie Allen's home that they contend were caused by two plumbing leaks. Through several summary judgments and directed verdicts, the trial court concluded the Allens had not established the damages were covered by the policy and rendered a take-nothing judgment in favor of State Farm. The Allens challenge the trial court's various rulings and the take-nothing final judgment. We reverse the trial court's judgment and remand for further proceedings.

# I. BACKGROUND

The Allens' home was built in 2005 in Cedar Hill, Texas. Before 2009, the Allens had not had any problems with the home's foundation. Julie Allen testified a sewer pipe leaked in 2006 on the northeast corner of the house, but the leak did not affect the home. In late 2009, on two separate occasions two months apart, the water line leading from the water main meter to the Allens' house developed a leak near the meter. The two leaks together emptied over 244,000 gallons of water onto the Allens' property. Sometime later, the Allens noticed their home was settling and cracking both inside and outside, primarily on the southwest side in the master bedroom, bathroom, and closet. The damages resulting from an unlevel floor were significant enough that Charles Allen, a wheelchair-bound paraplegic, had difficulty accomplishing his daily life tasks, such as showering and brushing his teeth. Although the standard homeowners policy did not cover foundation movement or damages from plumbing leaks, the Allens had purchased endorsements covering these perils and filed a claim with State Farm.

State Farm sent Ricky Richards of Norseman Engineering to inspect the Allens' house and conduct an engineering evaluation in February 2010, two months after the second leak had been repaired. In his report prepared a month later, Richards noted that at the time of his inspection, the crawl space was standing in about three or four inches of water and the house was about two inches out of level. He did not dispute that the water in the crawl space was the cause of the foundation movement, which in turn was the cause of the damages. He concluded, however, that the plumbing leaks were not the source of the water in the crawl space or the resulting foundation movement because the yard had positive drainage away from the house and the leaks were located about seventy feet away from the house. Instead, he concluded that the source of the water in the crawl space and the resulting foundation movement was rainfall, which

he said had been unusually heavy during that time. He took the following photographs during his inspection; the water main is up the hill in both photographs:


PLAINTIFF'S
EXHIBIT
8dd


Julie Allen
Claim No. 43-E555-811
Norseman No. E10-0210-007



02/22/2010

**Photograph No. 41:** West view across the front lawn.



02/22/2010

**Photograph No. 42:** South view up the slope from the front lawn towards the leak.

Richards noted his observations of the exterior and interior of the house with respect to soil, slope, drainage, condition, and damages. He reviewed the water usage for the relevant periods and determined that the usage corresponded with the reported leaks. The water usage in October 2009 was approximately 80,000 gallons above the usage the prior month; and in December 2009, the water usage was approximately 166,000 gallons above the usage for the months before and after December. But he concluded that this "major discharge" did not enter the crawl space because of the location of the leaks and because the water followed the natural grade of the lawn, and "did not flow next to the perimeter grade beam, because the lawn at the southwest corner of the house slopes away from the foundation."

Richards referred to a U.S.D.A. Conservation Survey for Dallas County to describe the characteristics of the soil in and around the Allens' residence. The survey indicated that the soil in that area was "corrosive and well drained." The permeability, which Richards said refers to the rate at which water can flow through the soil, was very slow; and the water capacity, which he said is the amount of water that the soil can hold before it becomes saturated, was high. According to the survey, "the vertical speed of water movement through soil with very slow permeability is less than 0.06 inches per hour." The survey also indicated that the soils in that area "have high to very high shrink/swell potential."

Richards explained that the most common cause of foundation movement in a pier and beam foundation such as the Allens was shrinking or swelling of the soil due to changes in the moisture content. He made a diagram of the elevations and contours and concluded that the low areas in the foundation did not correlate with the flow pattern from the plumbing leaks and, instead, indicated settlement. He stated that the crawl space was flooded two months after the second leak was repaired, indicating "the current flooding is more closely associated with ongoing heavy rains in this area." Based on Richards' report, State Farm denied coverage.

–4–

The Allens sued State Farm for breach of contract and insurance code violations. The trial court granted summary judgments in favor of State Farm on several issues. The claims remaining for trial were breach of contract and statutory violations.

At trial, Charles Allen described seeing water coming out of the meter box and going downhill and traveling to the left, or southwest corner, of the house during the first leak. And he said when Richards conducted his inspection, the outside of the house was "very, very wet around like around that corner and in the front right there and around the side."

Julie Allen testified that she saw a lot of water coming from the water main during both leaks. In December 2009, she drove into the driveway and saw water "kind of gushing out again in the same area." She walked over to the water main and then toward the house. She said the ground was saturated. She said if she could "draw the line, it would be straight towards the shower, that area there," demonstrating on the photographs; the shower was located near the southwest corner of the house. She said she had "[n]o doubt" that the water from the plumbing leak "was coming down that way and going right at the house." She said she "walked over to the side of the house. My shoes would sink into – because there was so much water." Using photographs, Julie Allen demonstrated the areas she was talking about. She testified she believed the house had suffered deterioration, which she defined as a "breakdown of something," as a result of the plumbing leaks.

The Allens also presented testimony from three engineering experts, a residential building contractor, and the State Farm adjuster who handled the Allens' claim. Two of the Allens' experts, Tom Witherspoon and Ralph Mansour, disagreed with State Farm's expert and concluded that the damages to the Allens' house were caused by the plumbing leaks, not rainfall. The other expert, John Foose, was not presented as a causation expert. Witherspoon believed the plumbing trench that contained the water line from the main meter to the house acted as a

conduit for the over 244,000 gallons of water from the leaks and that some of that water went under the house into the crawl space. Mansour also believed the water from the leaks entered the crawl space and, while he testified that he believed the water passed through the surrounding soil to get there, he could not rule out that the water also followed the plumbing trench.

State Farm's adjuster, Laura Milne, testified she went to the Allens' house on February 22, 2010. She said her "visual observation of the yard showed that the slope ran down and around the corner of the house." Referring to photographs, she said she walked around the house and the ground was wet. When asked where the water came from, she said "[t]he rain." She agreed that the gutters and swale took the rain away from the house and could not explain why "that whole area [was] soaked" if it was not from the plumbing leaks.

Milne testified that the policy would provide coverage under the Dwelling Foundation Endorsement if the water from the plumbing leaks went under the home and caused foundation damage. But she said her inspection and the engineer's report revealed that the leak did not affect the house because the water went around the house. She said she recommended denial of the claim after looking at the yard and reviewing the engineer's report. She testified she conducted a reasonable investigation, but she also testified she did not test the water in the crawl space or make an effort to determine if the water that leaked underground could have entered the crawl space. She said she did not believe these actions were necessary because she did not "believe that the water went underneath that foundation to damage it. I believe the water went around the house."

After the Allens rested their case-in-chief, State Farm moved for and the trial court granted four directed verdicts on liability and damages, taking the contract claim away from the jury. The trial court then rendered a final take-nothing judgment against the Allens, effectively dismissing the Allens' remaining statutory claim.

On appeal, the Allens challenge many of the trial court's rulings. In five issues, they argue the trial court erred by

▪ directing a verdict on the contract claim when there was a fact issue regarding coverage under the two endorsements to the policy and whether the Allens proved damages;

▪ rendering a take-nothing judgment on the statutory claims; and

▪ granting summary judgment against them on their claim that State Farm's statutory violations were committed "knowingly."

## II. BREACH OF CONTRACT

The trial court granted a directed verdict against the Allens on their breach of contract claim. The Allens alleged that their insurance policy provided coverage for the damages to their home under both the dwelling foundation and water damage endorsements, and they argue that they presented expert testimony and fact witnesses to support their claims. State Farm moved for directed verdict regarding coverage under the Dwelling Foundation Endorsement arguing the Allens' experts presented no evidence the plumbing leaks caused the water in the crawl space. And State Farm moved for directed verdict regarding coverage under the Water Damage Endorsement arguing the damages were caused by foundation movement, not deterioration from a plumbing leak.

### A. Standard of Review

A directed verdict is proper when the evidence is such that no other verdict can be reached and the moving party is entitled to judgment as a matter of law. *Cooper v. Sanders H. Campbell/Richard T. Mullen, Inc.*, No. 05-15-00340-CV, 2016 WL 4487924, at *4 (Tex. App.—Dallas Aug. 24, 2016, no pet.) (mem. op.). We review an order granting a directed verdict using the standard of review for assessing the legal sufficiency of the evidence. *Id*. We consider all the evidence in the light most favorable to the nonmovant and resolve all reasonable inferences in the nonmovant's favor. *Id*. If a fact issue is raised on a material question, the issue must go to the

jury and a directed verdict is not proper. *Id*. If a trial court's directed verdict is based on a question of law, we review that aspect of the ruling de novo. *Id*. A fact issue is raised if the evidence would allow reasonable, fair-minded jurors to differ in their conclusions. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003).

**B. Burdens of Proof**

The insured has the initial burden of proving the insurance policy provides coverage for the claimed damages. *JAW The Pointe, L.L.C. v. Lexington Ins. Co.*, 460 S.W.3d 597, 603 (Tex. 2015). The burden then shifts to the insurer to plead and prove that the loss falls within an exclusion to coverage. *Id*. If the insurer proves an exclusion applies, the burden shifts back to the insured to prove an exception to the exclusion brings the claimed damages back into coverage. *Id*. "Generally, an endorsement or rider that provides specific coverage trumps an exclusion contained within the policy's primary forms." *Id*. at 605 n.7, 606. Because an endorsement provides coverage that would otherwise be excluded, the insured has the burden to prove the damages fall within the endorsement. *See id*.

**C. Dwelling Foundation Endorsement**

It is undisputed that the Dwelling Foundation Endorsement would provide coverage for the damages to the Allens' house if the foundation movement was caused by the plumbing leaks. The Allens presented the opinions of three engineers to establish damages and causation. In its motion for directed verdict, State Farm argued that the testimony of these experts was conclusory and speculative and constituted no evidence the plumbing leaks caused the foundation movement.

Conclusory statements of an expert are legally insufficient evidence. *Dallas Cty. v. Crestview Corners Car Wash*, 370 S.W.3d 25, 55 (Tex. 2012). A conclusory opinion is an opinion without a basis, such as "Take my word for it, I know," or an opinion with a basis that

does not support the opinion. *Rogers v. Zanetti*, 518 S.W.3d 394, 405, 409 (Tex. 2017). A non-conclusory opinion is one that has "a 'demonstrable and reasoned basis on which to evaluate [the expert's] opinion.' This basis must come in the form of an answer to the question 'Why': Why did the expert reach that particular opinion?" *Id*. at 405 (quoting *Elizondo v. Krist*, 415 S.W.3d 259, 263 (Tex. 2013) & *Burrow v. Arce*, 997 S.W.2d 229, 236 (Tex. 1999)) (internal citation omitted).

We examine each expert's testimony to determine whether it was conclusory and, as a result, no evidence of causation.

### 1. John Foose

John Foose, a civil engineer, testified that he prepared a report in November 2004 of the site upon which the Allens' house would be built. The formation in that area is known as Eagle Ford Shale and is "highly expansive." He said expansive soils cause many problems for structures. His report showed that he drilled two test borings near where the Allens intended to build their house and conducted tests of the soil and rock for use by a structural engineer in designing the foundation. He said he performed test borings on four or five other home sites in that area as well. None of the test borings showed the presence of underground water. He encountered Eagle Ford shale at a depth of about nine feet. His report described the soil strata in the borings and the plasticity index of the soil. He testified that a plasticity index above 35 indicates "a volatile soil" and the plasticity index at the Allens' site was "well above that." His report also noted that other tests indicated the soil was "very volatile."

Foose recommended a pier and beam foundation or an elevated concrete slab support on piers. His report stated that if the designer and homeowner chose a pier and beam foundation, "[a] void must be created below the [perimeter] beams to prevent swelling soil exerting pressure on the bottom of the beam." He explained two methods of creating the void. The preferred

method was to have the bottom of the perimeter beam a foot above ground level with soil retainers along the perimeter to prevent soil from collapsing into the space. The other method was to use carton forms under the perimeter beam to create the void. He said the void would be smaller and "great care must be taken to prevent the forms [from] collapsing when the concrete is placed." He testified he did not know which method was used on the Allens' house.

Foose also recommended piers be used on the interior of the house, but he did not know if that had been done. He explained that using "spread footings or shallow footings" instead of piers on the interior "could be a problem" in the expansive clay soil.

Foose testified generally that when a house is constructed, the plumber digs a trench from the water main to the house in which the plumber lays the water line to the house. He said typically the pipe goes underneath the perimeter beam, comes up into the crawl space, and is distributed to the kitchen, bathrooms, and other rooms where water is needed. He testified based on his experience that the soil in the "trench is normally more loosely compacted than the surrounding soil" and serves as a conduit for water when there is a leak. In other words, water from a leak will "migrate along the trench" and "wind up underneath the house" because gravity would "pull [the water] downhill, which in this case is toward the home." He explained that the soil is more loosely compacted in the trench because the plumber cannot use heavy equipment to compact the soil around the pipe because it would break the pipe. His report recommended that plumbing trenches be "backfilled with well-compacted natural clay soil to prevent water migrating beneath the slab through porous fill in the trenches."

Foose referred to pictures of the Allens' home under construction in explaining his testimony. He admitted he did not have personal knowledge about how the trench at the Allens' home was backfilled. Foose testified that if water had traveled through the plumbing trench, he would expect to see water under the house and perhaps some evidence of it traveling along the

–10–

trench. He testified that with "a big leak, a lot of [the water] is going to go – migrate along the trench . . . [and] wind up underneath the home."

Foose testified that if water stands for an extended period of time, it can soften the soil and cause the soil to swell. He explained that clay soil is resistant to the passage of water and when it is wetted becomes more resistant. He also testified that if the site had been graded according to his initial report, surface water, such as rain, "would drain away from the house in all directions" and the only other sources of water in the crawl space would be the broken water pipe or sprinkler heads placed too close to the perimeter beam.

In summary, Foose explained generally how water from the plumbing leaks could enter the crawl space, specifically, by flowing through the more loosely compacted plumbing trench and being pulled toward the house because of gravity. To the extent Foose testified about causation,[1] this is not a conclusory opinion because it has a satisfactory basis to support the opinion.

### 2. Tom Witherspoon

Tom Witherspoon, a civil engineer with a concentration in geotechnical engineering, testified that he investigated the problems with the Allens' house in March 2012, about two years after the leaks were repaired, and prepared two reports about three months apart. He inspected the house three times and the crawl space twice in connection with his investigation. He prepared a full elevation survey which showed the master bath and bedroom (on the southwest corner) "were greatly elevated over the rest of the house" and had substantial cracking. He observed water stains on the crawl space indicating water had stood in that space for some period of time. He said when water fills up in a crawl space, it is dirty water and leaves a mark. The line

---

[1] State Farm objected to Foose's testimony on causation because he was not designated as an expert witness on causation. The trial court sustained the objection. However, State Farm did not move to strike Foose's testimony, and Foose offered additional testimony to which State Farm did not object after State Farm's objection was sustained.

indicated a water depth at one time of four to six inches in the crawl space. The crawl space was wet, which he found was significant, but did not have standing water. He recommended excavating the perimeter to see if the piers or the grade beam had moved. He also believed that the standing water would not have affected the foundation if the piers and void boxes were constructed according to the foundation design.[2] He looked for records about the pier construction but was unable to find them.

He also observed wood shims between the piers and the floor joists used to adjust the elevation of the house. The shims were of soft wood that compressed due to the humidity from the water standing in the crawl space. He said humidity will saturate wood and make it more vulnerable to compression.

In June 2012, Witherspoon excavated two holes near the grade beam to find out if the piers had the proper penetration into the rock and if there were void boxes under the grade beams. He described how he excavated the holes and examined the piers. Referring to the photographs of the holes, he said the first pier he examined was "competent in that it had not pulled apart" but that it had heaved up with the grade beam; the other pier had stayed down and the grade beam heaved up about two inches off the pier. He determined that the first pier failed and the second one held. And he did not see any remnants of a void box in those two holes.

In preparing his report, Witherspoon reviewed the Foose soil report and the Richards report. Richards' elevations were consistent with Witherspoon's, but Witherspoon disagreed with Richards' conclusions. Witherspoon testified that the leak was about seventy feet away from the house below ground in the plumbing trench. He said water normally follows the trench.

---

[2] Witherspoon said:

> Void boxes are a cardboard box and it's covered with a waterproof seal. And these are put under the grade beam. They're very strong. You put them at the bottom of the forms and then you put your steel in there and they don't compress right then. They'll hold up the concrete, the concrete's poured and then you have this void under there so that over time the soil swells, it will compress that cardboard, but it won't push against the bottom of the grade beam. So it gives you future protection against swelling and shrinking.

Referring to a photographs of the Allens' house, he said "you see some of the material that came out of there. It's – you've got a combination here of some – it looks like some gravel or rock material or something that's pulled out of there. When a plumber backfills that, he can't compact it real well because if he compacts it well he'll break the line. So the dirt's just pushed back in there because it's out in the yard and it doesn't matter. And so never does this get proper compaction. So you've got kind of a loose conduit for water that would leak into that trench." Witherspoon testified that the trench is "going right under the grade beam at the front of the house and it's going right into the crawl space." He said "as long as this leak went on . . . it would have flooded that crawl space. I mean, it has a nice conduit right there running along that PVC line where the loose material has been pushed into the ditch."

Witherspoon disagreed with Richards' conclusion that the current flooding in the crawl space was caused by ongoing heavy rains. He said when water gets into the crawl space, it has nowhere to go and will sit there and the soil acts as a bathtub to hold the water. He testified that "more water was probably going along the surface of the ground than going through the ditch into the house," but he also said "a significant amount of water would go through that ditch." He explained how that would happen: When the water "goes down, hydrostatic pressure pushes it up" and "you've got a higher head of hydrostatic pressure where the leak is and [ ] where the crawl space is. . . . Any time water is higher here than here, there's hydrostatic pressure pushing that down" and then the water "comes up where it's open."

When State Farm asked Witherspoon how the water would come up to the surface and flood the crawl space, he said, "Any of the plumbing lines come up in that crawl space and they run into services in the house. And you've got a higher head out here in that ditch that's pushing down. So you have the hydrostatic pressure of that. And when it finds piping and everything, it comes up in the crawl space" around the pipes. State Farm questioned whether the water from

the leaks could enter the crawl space because of the swale in the front yard that directs water away from the house and because the house is on a slight incline past the swale. Witherspoon agreed that "water when it reaches down at the bottom of a hill just start[s] collecting at the bottom of the hill," but he also said "we don't have a lake down there. We have soil for that to travel through" and "[w]hen you've got a higher head" on the other side, water can go uphill because "that higher head is pushing that down and it tends to reach its own level where that head is." He said the water would "seep up in that crawl space" and "[i]t will start filling up in that crawl space and then it will reach its level in there." He also testified that clay soil "wicks a long way" and "very quickly."

State Farm also questioned Witherspoon about the construction of the foundation. In Witherspoon's opinion, the foundation was not constructed according to the design because he did not find evidence of void boxes when he excavated two holes around the grade beam. He said this design defect contributed to the foundation's movement. But he testified that it appeared most of the piers had performed adequately. He said the possibility that spread footings were used in the interior instead of piers was "quite remote" because there was little or no movement at the interior. He said, based on the plasticity index of that area, he would expect to see upheaval of around six to eight inches at the interior of the home if spread footings had been used, but there was no upheaval in that area. He said he found distress over the entire house, but the "most dramatic distress was at that southwest corner" by the master bedroom, bath, and closet. He testified there was "no way there could be spread footings in there. You would have such dramatic movement in this expansive clay. That center would have pushed up eight to ten inches. I mean, it would have been off the chart."

Witherspoon testified that he viewed the house again two days before trial and saw no difference in the water line from the first time he observed it and no standing water. He observed

positive drainage away from the house and nothing to suggest that rainfall runoff would pond against the house to create the amount of water in the crawl space.

In summary, Witherspoon testified that in his opinion the water in the crawl space was caused by the plumbing leaks. He explained how the plumbing trench acted as a conduit and hydrostatic pressure caused the water to rise to the surface in the crawl space. This is not a conclusory opinion.

### 3. Ralph Mansour

Ralph Mansour, a structural engineer, testified that he inspected the Allens' house two years after the leaks were repaired and found water in the crawl space. He testified that he went to the Allens' house in 2012. He talked to Julie Allen who told him about the plumbing leaks and what she and Charles Allen observed, took a history of the house, conducted an investigation, reviewed Richards' report, and prepared a report of his findings.

Mansour explained that the history of the house showed that water had never been three or four inches above the ground in the crawl space except at the time of the leaks, and rain from the roof or yards would keep the ground moist but would not accumulate to a depth of three or four inches. As part of his investigation, he photographed the house, took elevations, and prepared a document showing "the zone of correlated distress" in which he correlated the house to the plumbing leaks. He shaded the part of the house he believed was impacted by the leaks.

Mansour testified that he checked the rain records for the months of October, November, and December 2009 "on the website. I believe it's the NOAA. That's the national weather something." He explained that soil needed about four inches of rain "not to move." He said there was a little more rain than usual in October, about eight inches, but in November and December only two inches of rain, which is less than what the soil needs. He said these rainfall reports

–15–

contradicted the report of State Farm's expert that the water in the crawl space was due to unusually heavy rainfall.

Mansour performed calculations based on the amount of water Richards reported had leaked over the two months and concluded that if only 1% of the water from the leaks discharged under the house it would cause the damage seen at the Allens' house. He was asked if more than 1% of the water ended up under the home, and he said he did not know. Mansour testified there "was enough pressure on that line that it forced some of the water through the soil and up to the surface."

When Mansour was asked by State Farm whether he believed that any of the water from the leaks could have traveled through the plumbing trench from the meter to the house, he said he could not rule it out. He said he was aware that Witherspoon found no void boxes in two places under the grade beam, but he disagreed that the absence of void boxes in two holes meant there were no void boxes at all around the entire foundation.

In summary, Mansour testified that the plumbing leaks caused the water in the crawl space based on the house's history, the pressure created by the leak, and the observations of the homeowner. He also said he could not rule out that water traveled to the crawl space through the plumbing trench. This is not a conclusory opinion.

State Farm argues that the experts' opinions are inconsistent and therefore constitute no evidence because Witherspoon believed the water flowed through the plumbing trench while Mansour believed the water flowed through the soil. But because Mansour actually testified that he could not rule out that the water could have flowed through the plumbing trench, there is no inconsistency in the experts' opinions. State Farm also argues that the experts' bases are unreliable, but it did not object to the experts' testimony on this ground and may not challenge their reliability on appeal for the first time. *See Crestview Corners Car Wash*, 370 S.W.3d at 55

(when opinion not conclusory but basis unreliable, objection at trial required to challenge on appeal).

Viewed in the light favorable to the Allens, there was more than a scintilla of evidence that the plumbing trench, hydrostatic pressure, and gravity worked in tandem to cause the over 244,000 gallons of water from the plumbing leaks to travel downhill and rise to the surface in the crawl space. Accordingly, the trial court erred by directing a verdict on the experts' opinions as to causation and thereby dismissing the Allens' claim under the Dwelling Foundation Endorsement. *See Zanetti*, 518 S.W.3d at 401 (causation generally a fact question and may be determined as matter of law only when reasonable minds could not arrive at different conclusion).

### D. Water Damage Endorsement

State Farm orally moved for directed verdict on the breach of contract claim arguing there was "no evidence of any damages which fit under the water damage endorsement in this policy." The Water Damage Endorsement provided coverage for "the deterioration, wet rot or dry rot of property . . . caused by the continuous or repeated seepage or leakage of water from a . . . plumbing system . . . ."

State Farm argued that the Water Damage Endorsement did not apply because "that's not the situation we have here. It's not continuous and repeated. It's not like a long-term kind of thing. It's not deterioration, regardless of what [the Allens] got some of the witnesses to say. Those are not fact questions. That's a question for the Court and the Court can apply what the real definition of deterioration is. It's not the movement of the foundation." In response, the Allens argued that the policy did not define the terms, did not require "long-term," and there was evidence of deterioration. The court granted the directed verdict without stating a basis.

We review the trial court's construction of an insurance contract de novo. *Nautilus Ins. Co. v. Steinberg*, 316 S.W.3d 752, 755 (Tex. App.—Dallas 2010, pet. denied). When an insurance policy does not define its terms, we give those terms their ordinary and generally accepted meanings. *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010). If an insurance policy is susceptible of more than one reasonable interpretation, we resolve the uncertainty by adopting the construction that favors the insured. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co., Inc.*, 811 S.W.2d 552, 555 (Tex. 1991).

The policy here does not define "deterioration," "continuous," or "repeated." "Deterioration" has been defined as to "worsen" and to "become progressively worse." *Deterioration*, THE NEW OXFORD AMERICAN DICTIONARY 466. It has also been defined as "the action or process of deteriorating or state of having deteriorated: gradual impairment." *Deterioration*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 616. To "deteriorate" means "to make inferior in quality or value"; "impair"; "become impaired in quality, state, or condition: degenerate." *Id*. "Repeated" has been defined as "renewed or recurring again and again. *Id*. at 1924. It has also been defined as "do (something) again, either once or a number of times." *Repeated*, THE NEW OXFORD AMERICAN DICTIONARY 1443.

Although the record does not show when the plumbing leaks started, it is undisputed there were two leaks and they were discovered two months apart. Because a reasonable interpretation of "repeated" is something that happens again, "either once or a number of times," *id*., and there is evidence of two plumbing leaks, there is some evidence that the plumbing leaks were "repeated" within the meaning of the Water Damage Endorsement.

Milne testified that to be covered by the Water Damage Endorsement, the damages must have occurred over a long period of time. She agreed that the endorsement did not include the

–18–

words "long-term" and that State Farm "insert[s] the words 'long-term' when they read this" provision. She testified that in order to have "deterioration, it has to have been long-term." At one point she said she would think it would have to be more than ten years to be considered "long-term." However, she agreed that the Allens' foundation was deteriorating. She also agreed that if the problems were caused by the plumbing leaks, this endorsement would provide coverage. Additionally, the Allens' experts testified that humidity from the water in the crawl space, not foundation movement, caused the wood shims to fail and the wood floors to cup. This is more than a scintilla of evidence of "deterioration" "caused by the continuous or repeated seepage or leakage of water or steam from a . . . plumbing system."

State Farm argues, however, that these damages are all related to foundation movement, not water damage. It cites *Salazar v. State Farm Lloyds*, No. H-13-1904, 2014 WL 2862760 (S.D. Tex. June 24, 2014), to support its argument. In *Salazar*, the court examined two similar endorsements and concluded that the water damage endorsement did not provide coverage because all the damages were caused by foundation movement, which was not covered by the water damage endorsement. *Id.* at \*2–3. But here, the Allens presented evidence of damages caused by water damage, specifically humidity in the crawl space created by the standing water. The Salazars offered no evidence of damages that were unrelated to foundation movement and, consequently, *Salazar* does not control our analysis. *See id.* at 2–3.

State Farm also cites our *Nautilus* opinion for the proposition that the trial court properly directed a verdict because it was a question for the court whether "deterioration" had occurred and whether the claimed property loss fell within the scope of the Water Damage Endorsement. We disagree.

In *Nautilus*, the question was the meaning of "theft" in a policy that did not pay for losses or damage caused by or resulting from "theft" and whether the facts showed a theft had occurred.

316 S.W.3d at 755. The trial court interpreted the meaning of "theft" as used in the insurance policy, and then, as the fact-finder, applied that definition to the undisputed facts to reach its conclusion. *Id*. at 755–57. But because the facts are disputed here, the question of whether there was "deterioration" was not a question of law for the trial court. *See id*.

We conclude the Allens presented more than a scintilla of evidence of water damage. Consequently, the trial court erred by directing a verdict on their claim under the Water Damage Endorsement.

### E. Liability Limitation under Policy

The Allens also challenge the trial court's pretrial summary judgment limiting their total recovery under the policy to 15% of the dwelling coverage. State Farm moved for summary judgment on the liability cap and asked for the following relief:

> Therefore, State Farm seeks summary judgment on its claim that Plaintiffs' damages under the policy of insurance with Plaintiffs are limited to the total amount of $48,525.00, which constitutes 15% of the total amount of coverage available under the Coverage A- Dwelling coverage provisions of the subject insurance policy.

> WHEREFORE, PREMISES CONSIDERED, State Farm prays that the Court enter an order granting the above requested relief and granting such other relief to which State Farm may show itself justly entitled.

> The trial court granted State Farm's motion "in all things."

The Allens concede that coverage under the Dwelling Foundation Endorsement is limited to 15% of the coverage provided on the dwelling. But they argue that the trial court's ruling could also be interpreted to limit their total recovery, under all endorsements and other coverages, to the 15% cap. They contend there are other potential coverages under the policy that are not subject to a cap and that the 15% applies only to coverage under the Dwelling Foundation Endorsement. The Allens asked the trial court for a clarification of its ruling, and the trial court refused by written order.

State Farm notes that at the time it filed the motion for summary judgment on this issue, the Allens had not alleged a claim under the Water Damage Endorsement. However, in a footnote, State Farm argues that this "theory of liability was subsequently pleaded and litigated at trial, and this Court can affirm summary judgment on any basis supported by the record."

We previously concluded that the Allens raised a fact issue about coverage under the Water Damage Endorsement. And it is undisputed that the Water Damage Endorsement does not contain a 15% cap on liability. We agree with the Allens that State Farm's motion asked that the Allens' "total recovery" under "Coverage A" be limited to 15%. But Coverage A also provides coverage under the Water Damage Endorsement and damages for "loss of use," which are not subject to the 15% cap. We conclude, therefore, that the summary judgment erroneously limited "total recovery" under the policy to 15% of the coverage for the dwelling. We modify the summary judgment to state that State Farm's "Motion for Partial Summary Judgment Regarding the 15% Limitation Provision" is granted to the extent the Allens' recovery under the Dwelling Foundation Endorsement is limited to 15% of the dwelling coverage, but the motion is denied to the extent State Farm requested a cap on the "total recovery" of 15%.

**F. Contributing-Causation Clause**

State Farm argues that we must affirm the directed verdicts on the contract claim because the Allens did not rebut alternate theories of causation or address the policy's contributing-causation clause. According to State Farm, the policy excludes "'coverage for any loss which would not have occurred in the absence of' rainwater, surface runoff, or groundwater, 'regardless of other causes of the loss . . . or whether other causes acted concurrently or in any sequence with the excluded loss.'" State Farm argues that even if the foundation movement was caused in part by the plumbing leaks, "the resulting property loss is not covered if rainwater, groundwater, or surface water was also a contributing cause." State Farm cites *JAW The Pointe, LLC* to support

its argument that the Allens were required to "show that the loss was ***not*** caused in part by this non-covered peril." We disagree.

In *JAW The Pointe* it was undisputed that the losses suffered by the insured were caused by both a covered (wind) and a non-covered (flood) peril. 460 S.W.3d at 610. The insurance company argued that the policy's anti-concurrent-causation clause operated to exclude all coverage when damages were caused by both covered and non-covered perils. *Id*. The supreme court agreed. *Id*. In doing so, however, the court held that the insurance company "sustained its burden" to establish that the anti-concurrent-causation clause excluded coverage. *Id*. In other words, the court held that the insurer has the burden to prove a loss is excluded by the anti-concurrent-causation clause because the clause operates to exclude coverage for damages caused by a covered peril if any of the damages were also caused by a non-covered peril. *See id.* at 607.

Pursuant to *JAW The Pointe*, it was not the Allens' burden to "rule out rainwater, surface runoff, and groundwater as contributing causes of their claimed property loss" as State Farm contends. Instead, once the Allens presented more than a scintilla of evidence that they suffered damages caused by the plumbing leaks, it was State Farm's burden to establish the damages were excluded by the contributing-causation clause. *Id*. But, because the trial court concluded that the Allens had not presented more than a scintilla of evidence to support their claims and it directed a verdict against them, the trial court did not consider and we need not address whether the contributing-causation clause applies here. *See State Farm Lloyds v. Hanson*, 500 S.W.3d 84, 94–95 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (after insured met initial burden to establish coverage, burden shifted to insurer to conclusively establish loss fell within exclusion).

We sustain the Allens' first issue.

**G. DAMAGES**

In issue two, the Allens argue that the trial court erred by directing a verdict on their breach of contract claim on the ground they produced no evidence of damages. We agree.

State Farm's motion for directed verdict argued that the Allens presented no evidence of the proper measure of damages because (1) the proper measure of damages under the policy is "actual cash value" (meaning replacement cost minus depreciation), and (2) the Allens presented no evidence of depreciation. On appeal, the Allens argue that the proper measure of damages is actual cost to repair or replace, for which they presented more than a scintilla of evidence, and that the "actual cash value" clause was a damages limitation that placed on State Farm the burden of producing evidence concerning depreciation.

The parties' respective arguments present the question whether "actual cash value" as used in the policy is a contractual measure of damages or a limitation on the insurer's liability. Based on our review of the language used in the policy and relevant case authority, we conclude that "actual cash value" is a limitation on the insurer's liability.

To determine whether a policy states a measure of damages or only limits the insurer's liability, we must consider the language of the policy. *Crisp v. Sec. Nat'l Ins. Co.*, 369 S.W.2d 326, 328 (Tex. 1963). "Exceptions or limitations on liability are strictly construed against the insurer and in favor of the insured." *Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660, 668 (Tex. 2008).

The loss settlement endorsement in the Allens' policy states:

COVERAGE A LOSS SETTLEMENT ENDORSEMENT

. . .

a. We will pay the cost to repair or replace . . . the damaged part of the property covered under Section I – Coverages, Coverage A – Dwelling . . . subject to the following:

(1) until actual repair or replacement is completed, we will pay only the actual cash value at the time of the loss of the damaged part of the property, up to the applicable limit of liability shown in the Declarations, not to exceed the cost to repair or replace the damaged part of the property;

(2) when the repair or replacement is actually completed, we will pay the covered additional amount you actually and necessarily spend to repair or replace the damaged part of the property, or an amount up to the applicable limit of liability shown in the Declarations, whichever is less;

. . .

A plain reading of the policy shows that it provides coverage "to repair or replace" the damaged property. The policy covers the cost to repair or replace, but only if the insured first actually repairs or replaces the damaged property, and then only an amount that "does not exceed the cost to repair or replace" or "an amount up to" the limit of liability as stated in the policy. Additionally, the Dwelling Foundation Endorsement covers "loss" and includes "cost of tearing out and replacing"; and the Water Damage Endorsement covers "deterioration, wet rot or dry rot of property" including "the cost of tearing out and replacing . . . ."

This language, when read together, provides coverage to repair or replace property damaged by a plumbing leak. And while the loss settlement endorsement limits the initial payment to the actual cash value of the damaged property, actual cash value is not the measure of damages for which the policy provides coverage. Instead, this language is like the limitation-of-liability language in *Crisp*. *See id*. ("liability hereunder shall not exceed the actual cash value of the property at the time of loss, . . . nor shall it exceed the amount it would cost to repair or replace the property with material of like kind and quality within a reasonable time after the loss"). We conclude that "actual cash value" as used in the Allens' policy is a limitation on State Farm's liability, for which State Farm, not the Allens, bore the burden of proof. *See id.*; *see also Dallas Nat'l Ins. Co. v. Calitex Corp.*, 458 S.W.3d 210, 222 (Tex. App.—Dallas 2015, no pet.)

–24–

(insured bears initial burden to show coverage and burden then shifts to insurer to show exclusion applies).

Here, State Farm does not contend that the Allens produced no evidence of cost to repair or replace. State Farm argues, instead, that the Allens were required to present "some reasonable, quantifiable basis for allocation of damages" between the covered and non-covered perils and they failed to do so. The Allens contend that State Farm did not raise this as a basis for its directed verdict and cannot raise it for the first time on appeal. We agree.

A party must state specific grounds for its motion for directed verdict. TEX. R. CIV. P. 268 ("A motion for directed verdict shall state the specific grounds therefor."). The only time the failure to state specific grounds is not fatal to a directed-verdict motion is when the evidence raised no fact issues. *Tex. Emp'rs Ins. Ass'n v. Page*, 553 S.W.2d 98, 102 (Tex. 1977). We have concluded the Allens presented a fact issue on their claim for breach of contract and the directed verdict was improper. We will not consider State Farm's argument for affirming the directed verdict, made for the first time on appeal. *See id*.

We sustain issue two.

## IV. EXTRACONTRACTUAL CLAIMS

The Allens alleged claims under the insurance code for failure to (A) conduct a reasonable investigation, (B) effectuate a prompt and fair settlement, and (C) provide a reasonable explanation for claim denial. The Allens asserted that State Farm knowingly violated these statutes. The trial court granted judgment in favor of State Farm on each claim. In issues three, four, and five, the Allens challenge the trial court's rulings.

### A. Failure to Conduct Reasonable Investigation

In issue three, the Allens argue the trial court erred by granting a directed verdict on their claim for failure to conduct a reasonable investigation. Section 541.060(a)(7) of the Texas

Insurance Code states that "[i]t is an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to" refuse "to pay a claim without conducting a reasonable investigation with respect to the claim[.]" TEX. INS. CODE ANN. § 541.060(a)(7) (West 2009).

In its motion for directed verdict, State Farm argued that the Allens had to prove an injury independent of the policy benefits to be entitled to relief on this claim and they failed to do so. However, the supreme court has held that when an insured establishes a right to recover under an insurance policy, the insured may recover the policy benefits as actual damages for a statutory violation. *USAA Tex. Lloyds Co. v. Menchaca*, No. 14-0721, 2017 WL 1311752, at *7–9, *12 (Tex. Apr. 7, 2017). In light of the holding in *Menchaca* that no independent injury must be shown for failure to conduct a reasonable investigation when the insured has shown he was entitled to benefits under the policy, and in light of our holding that the Allens raised a fact issue about whether they were entitled to benefits under the policy, we conclude the trial court erred by directing a verdict on this statutory claim.

We sustain issue three.

**B. Failure to Effectuate Prompt and Fair Settlement**

In a subpart under issue four, the Allens argue the trial court erred by granting a no-evidence summary judgment on their claim that State Farm failed to attempt to effectuate a prompt and fair settlement after liability became reasonably clear. *See* TEX. INS. CODE ANN. § 541.060(a)(2)(A).

Section 541.060(a)(2) states that it is an unfair act or practice to fail "to attempt in good faith to effectuate a prompt, fair, and equitable settlement of: (A) a claim with respect to which the insurer's liability has become reasonably clear[.]" *Id*. State Farm filed a pretrial no-evidence motion for summary judgment in which it argued the Allens had no evidence to support this

claim because State Farm's liability never became reasonably clear. In other words, State Farm argued the Allens had no evidence that at the time State Farm made the decision to deny coverage it knew plumbing leaks had caused the foundation movement.

In response to State Farm's motion, the Allens attached deposition testimony from State Farm's adjuster, Milne. She testified that she was aware there were two massive plumbing leaks at the Allens' residence and that her decision to deny the claim was "based on the fact that . . . the water ran down the yard and around the house and never entered the crawl space." She was asked how she was able to determine that the water went around the house, and she said, "I can look at the lawn." She testified that she did not "know how deep the water line is . . . that broke" and that she was "looking at the lawn from the standpoint of movement of surface water[.]" Then she was asked, "So what about water that is coming out of a water main that's pressurized and it's below the ground? Are you saying that that moves in the same way that the surface water moves?" Milne responded, "I don't know that it did not." She was asked, "how would those swales [in the yard] affect a pipe that was buried beneath the swales?"; she said, "I don't know."

We conclude Milne's deposition testimony raised a fact issue about whether State Farm's liability was reasonably clear. It was undisputed the leaks were underground. It was undisputed that 244,000 gallons of water discharged from two leaks over a two-month period. It was undisputed that some of that water rose to the surface and traveled down the hill. But Milne's deposition testimony about why she recommended the claim be denied was based on her observation of the surface of the yard without any investigation of how the *underground* water from the leaks may have traveled or entered the crawl space.

"[W]hether an insurer acted in bad faith because it denied or delayed payment of a claim after its liability became reasonably clear is [ordinarily] a question for the fact-finder." *The Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 56 (Tex. 1997) (whether insurer's liability

–27–

reasonably clear presents fact issue for jury when evidence conflicts). We conclude that the Allens raised a fact question about whether State Farm's liability was reasonably clear at the time it denied their claim. When evidence exists on both sides of an issue, it is a fact question for the jury to decide. *Id.*

We sustain this subpart of issue four.

### C. Failure to Provide Reasonable Explanation for Denial

In another subpart of issue four, the Allens argue that the trial court erred by sua sponte rendering a take-nothing judgment on their claim that State Farm failed to provide a reasonable explanation for the claim denial. *See* TEX. INS. CODE ANN. § 541.060(a)(3).

Section 541.060(a)(3) of the insurance code states it is an unfair act or practice for an insurer to fail "to promptly provide to a policyholder a reasonable explanation of the basis in the policy, in relation to the facts or applicable law, for the insurer's denial of a claim[.]" TEX. INS. CODE ANN. § 541.060(a)(3). The Allens tried this claim to the jury. Following the trial court's directed verdict on the contract claim, however, the court issued a final take-nothing judgment effectively dismissing this statutory claim without a motion to dismiss or other dispositive pleading from State Farm. We treat this as a sua sponte directed verdict. *See Deutsch v. Hoover, Bax & Slovacek, L.L.P.*, 97 S.W.3d 179, 195–96 (Tex. App.—Houston [14th Dist.] 2002, no pet.); *Rudco Oil & Gas Co. v. Gulf Oil Corp.*, 169 S.W.2d 791, 792 (Tex. Civ. App.—Austin 1943, writ ref'd w.o.m.). To defeat this sua sponte directed verdict, the Allens must show that they raised a fact issue on each element of their statutory claim. *See Deutsch*, 97 S.W.3d at 195–96 (trial court can grant sua sponte directed verdict as long as prevailing party below entitled to judgment as matter of law).

The Allens contend they raised a fact issue about whether State Farm failed to provide a reasonable explanation for the denial of the claim and cite us to State Farm's denial letter, which

they argue is conclusory and nonexplanatory. They also contend that State Farm's reliance on its expert was unreasonable. Although the Allens argue they raised a fact issue about the element of reasonableness, they do not argue that they raised a fact issue on the elements of causation or damages. They do not cite any evidence they produced at trial showing that State Farm's failure to promptly provide a reasonable explanation for the denial of their claim caused damages. Because the Allens failed to raise a fact issue as to each element of this claim, we conclude that the trial court did not err by granting a sua sponte directed verdict on this claim.

We resolve this subpart of issue four against the Allens.

### C. Whether State Farm Knowingly Violated Insurance Code

Section 541.152 sets out damages a prevailing plaintiff may recover when an insurer violates the insurance code in its claims handling, including "an amount not to exceed three times the amount of actual damages" if the trier of fact finds that the insurer knowingly committed the violations. TEX. INS. CODE ANN. § 541.152(b), (c) (West Supp. 2016).

In issue five, the Allens argue that the trial court erred by granting summary judgment in favor of State Farm on whether it knowingly violated the insurance code. The trial court granted summary judgment on the "knowingly" finding prior to trial. Given our disposition of the Allens' other appellate issues, and because we have concluded the Allens raised fact issues regarding many of their statutory claims against State Farm, the issue of whether State Farm knowingly violated the statutes is also a fact issue for the jury to decide. *See id.*; *see also Giles*, 950 S.W.2d at 56.

We sustain issue five.

## V. CONCLUSION

We affirm the trial court's judgment with respect to the Allens' claim for failure to provide a reasonable explanation for the denial of the claim. We otherwise reverse the trial court's judgment and remand for further proceedings consistent with this opinion.

/Lana Myers/

160108F.P05

LANA MYERS
JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

CHARLES R. ALLEN AND JULIE L. ALLEN, Appellants

No. 05-16-00108-CV     V.

STATE FARM LLOYDS, Appellee

On Appeal from the County Court at Law No. 2, Dallas County, Texas
Trial Court Cause No. CC-12-02015-B.
Opinion delivered by Justice Myers. Justices Francis and Whitehill participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** with respect to Charles R. Allen and Julie L. Allen's claim for failure to provide a reasonable explanation for the denial of the claim. In all other respects the judgment of the trial court is **REVERSED** and this cause is **REMANDED** to the trial court for further proceedings consistent with this opinion.

It is **ORDERED** that appellants Charles R. Allen and Julie L. Allen recover their costs of this appeal from appellee State Farm Lloyds.

Judgment entered this 1st day of August, 2017.