**Opinion issued May 25, 2023**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-21-00225-CV

————————————

**WESTLAKE CHEMICAL CORPORATION, Appellant**

**V.**

**BERKLEY REGIONAL INSURANCE COMPANY AND ZURICH AMERICAN INSURANCE COMPANY, Appellees**

---

**On Appeal from the 270th District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-43569**

---

## MEMORANDUM OPINION

This appeal involves a commercial insurance coverage dispute. Appellant Westlake Chemical Corporation tendered claims to Appellees Berkley Regional Insurance Company and Zurich American Insurance Company seeking coverage for nearly $16,000,000 in losses resulting from the payment of fraudulent invoices for

shipping bags used to export Westlake Chemical Corporation's products. After a dispute arose among the parties regarding coverage for the tendered claims, Westlake Chemical Corporation sued Appellees for breach of contract, violations of the Texas Insurance Code, and declaratory relief. Appellees counterclaimed for attorney's fees. The trial court granted summary judgment in favor of Appellees on Westlake Chemical Corporation's claims, and Appellees subsequently nonsuited their counterclaim for attorney's fees. This appeal followed.

Westlake Chemical Corporation argues the trial court erred in granting summary judgment in favor of Appellees. In two issues, Westlake Chemical Corporation argues the trial court erred by finding that (1) its loss was not covered by the insurance policy's computer fraud clause, and (2) the insurance policy contained an exclusion that barred coverage for its loss.

We affirm the trial court's judgment.

## Background[1]

Appellant Westlake Chemical Corporation ("Westlake") manufactures polyethylene and polyvinyl chloride products, which it sells internationally. From 2007 until 2014, Westlake purchased plastic shipping bags and other supplies to

---

[1] Appellant Westlake Chemical Corporation and Appellees Berkley Regional Insurance Company and Zurich American Insurance Company filed cross-motions for summary judgment and a joint statement of stipulated facts. This background section is based on the parties' stipulated facts.

export its products from John Tinkle ("Tinkle") through his company Tinkle Management Inc. ("TMI"), a supplier of shipping bags to chemical companies.[2] TMI delivered Westlake's plastic shipping bags to a warehouse owned by Packwell, Inc. ("Packwell"), a plastic bagging and logistics company, and Packwell used the supplies to package and ship Westlake's chemical products overseas. After the shipping supplies were delivered by TMI, Tinkle would submit an invoice to Westlake for payment of the supplies.

From March 2010 until October 2014, Tinkle submitted fraudulent invoices and supporting documentation to Westlake via email for fictitious bags that were never delivered to Packwell. Relying on these false invoices and shipping reports, Westlake paid Tinkle $16,423,941.78 for shipping bags that Tinkle never provided. Westlake did not discover Tinkle's fraud until October 23, 2014.

On July 21, 2015, Tinkle was indicted by a federal Grand Jury for fraud and money laundering. In April 2017, Tinkle pleaded guilty and was sentenced to 48 months in prison and ordered to pay restitution to Westlake in the amount of $15,633,403.98.

---

[2] During this time, Tinkle also worked as an employee of Packwell, Inc., a plastic bagging and logistics company that provided bagging and shipping services to Westlake.

## A. Insurance Contracts

Westlake purchased a Commercial Crime Insurance Policy from Appellee Berkley Regional Insurance Company ("Berkley") that provided coverage of $10,000,000 for each occurrence of computer fraud ("Berkley Policy") and a Crime Insurance Excess Policy from Appellee Zurich American Insurance Company ("Zurich," collectively with Berkley, the "Insurers") that provided Westlake an additional $5,000,000 in coverage ("Zurich Policy").

**Berkley Policy**

Section A.6 of the Berkley Policy, titled Computer Fraud ("Computer Fraud Clause"), provides that Berkley

> [W]ill pay for loss of or damage to "money", "securities" and "other property" resulting directly from the use of any computer to fraudulently cause a transfer of that property from inside the "premises" or "banking premises":
>
> a.    To a person (other than a "messenger") outside those premises; or
>
> b.    To a place outside those "premises".

Section D.1.c of the Berkley Policy excludes coverage for certain "Acts Of Employees, Managers, Directors, Trustees Or Representatives." Section D.1.c provides that coverage is excluded for

> Loss resulting from "theft" or any other dishonest act committed by any of your "employees," "managers," directors, trustees or authorized representatives:
>
> Whether acting alone or in collusion with other persons; or

4

While performing services for you or otherwise; except when covered under Insuring Agreement A.1.

The Berkley Policy does not define the terms "computer fraud," "from the use of any computer," or "authorized representative."

**Zurich Policy**

The Zurich Policy's "Insuring Clause" states:

[Zurich] shall provide [Westlake] with insurance coverage during the Policy Period excess of the [Berkley Policy]. Coverage under this policy shall attach only after all of the Limit(s) of Liability of [the Berkley Policy] has been exhausted by the actual payment of loss(es). Except as otherwise provided herein, coverage under this policy shall then apply in conformance with and subject to the warranties, limitations, conditions, provisions, and other terms of the [Berkley Policy] as in effect the first day of the Policy Period, together with the warranties and limitations of [the Berkley Policy]. In no event shall coverage under this policy be broader than coverage under [the Berkley Policy].

After Westlake discovered Tinkle's fraud in October 2014, Westlake tendered timely notices of its discovery and Proof of Loss Statements to Berkley and Zurich. On March 25, 2016, Berkley denied coverage for Westlake's loss under the Berkley Policy because the loss did not result directly from the use of a computer and because it resulted from a dishonest act by an authorized representative of Westlake. The parties do not dispute that Westlake's loss is not covered by the Zurich Policy unless the loss is also covered by the Berkley Policy.

**B.** **Procedural History**

On June 29, 2017, Westlake sued Berkley for breach of the Berkley Policy and violations of the Texas Insurance Code. Westlake also sought declaratory judgment against Zurich as to coverage. Westlake requested attorney's fees pursuant to Sections 37.009 and 38.001(8) of the Texas Civil Practice & Remedies Code, and statutory damages pursuant to Sections 541.152(a)(1) and 542.060(a) of the Texas Insurance Code. Berkley and Zurich counterclaimed for attorney's fees.

The Insurers filed a traditional and no-evidence motion for summary judgment on Westlake's claims. They argued that Westlake's losses were not covered by the Berkley Policy because the policy's Computer Fraud Clause only covered losses incurred as a result of computer hacking. They also argued that no evidence supported Westlake's extracontractual claims. Westlake cross-moved for summary judgment on its claims arguing its loss was covered because the Computer Fraud Clause in the Berkley Policy provides coverage for losses "resulting directly from the use of any computer" and Tinkle had submitted the fraudulent invoices and supporting documents via email. The Insurers later filed an Amended Motion for Summary Judgment arguing that Westlake's losses were not covered by the Computer Fraud Clause because the losses did not result "directly" from Tinkle's use of a computer to transmit the fraudulent invoices and supporting documents. The Insurers also argued the Computer Fraud Clause provides coverage only for

6

transfers of money fraudulently caused while accessing a computer without authorization. Following a hearing on the cross-motions for summary judgment, the trial court denied the motions, and directed the parties to prepare a Statement of Stipulated Facts and Documents and to re-file their motions for summary judgment.

The Insurers filed an Amended Motion for Traditional and No-Evidence Summary Judgment arguing they were entitled to summary judgment on Westlake's claims because Westlake's losses had not resulted from computer hacking, Tinkle's unauthorized access to Westlake's computer systems, the "use of any computer," or "directly" from Tinkle's emails. The Insurers also argued that coverage was barred by Section D.1.c. of the Berkley Policy because Tinkle was Westlake's "authorized representative" for purposes of ordering the shipping bags and supplies. The parties also filed a "Joint Statement of Certain Stipulated Facts and Documents for Purposes of Cross Motions for Summary Judgment." Westlake also filed a Traditional Motion for Partial Summary Judgment on its breach of contract claim against Berkley and its request for declaratory judgment against Zurich.

The trial court held a hearing on the amended cross-motions for summary judgment and during the hearing, the trial court denied Westlake's motion because the court found the Insurers proved that Tinkle was Westlake's "authorized representative" and thus, the Berkley Policy's exclusion barred coverage. After hearing further arguments, the trial court took the motions under advisement, and

continued the hearing to allow the parties to submit supplemental briefing concerning the Berkley Policy exclusion.

One month later, on September 26, 2019, the trial court denied the Insurers' Amended Motion for Summary Judgment. Then, on September 4, 2020, the trial court granted the parties' joint motion for rehearing. On March 15, 2021, Westlake filed a "Traditional and No Evidence Motion for Summary Judgment on Questions of Law for Resolution by the Court" regarding the interpretation of the Computer Fraud Clause.

On April 20, 2021, the trial court vacated its September 26, 2019 order, granted the Insurers' Amended Motion for Summary Judgment, denied Westlake's Traditional and No Evidence Motion for Summary Judgment on Questions of Law for Resolution by the Court, and ordered that Westlake take nothing on its claims against the Insurers. The Insurers subsequently non-suited their counterclaim for attorney's fees rendering the trial court's April 20, 2021 order a final and appealable judgment. This appeal followed.

**Summary Judgment**

Although a denial of a summary-judgment motion is generally not appealable, we may review the ruling when both parties have moved for summary judgment and the trial court grants one motion and denies the other. *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007); *Fallon v. Univ. of Tex.*

8

*MD Anderson Cancer Ctr.*, 586 S.W.3d 58, 63 (Tex. App.—Houston [1st Dist.] 2019, pet. denied). In our review of such cross-motions, we review the summary judgment evidence presented by each party, determine all issues presented, and render the judgment that the trial court should have rendered. *Tex. Mun. Power Agency*, 253 S.W.3d at 192; *Fallon*, 586 S.W.3d at 63. Each party bears the burden of establishing that it is entitled to judgment as a matter of law. *Tarr v. Timberwood Park Owners Ass'n*, 556 S.W.3d 274, 278 (Tex. 2018).

We review a trial court's order granting summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). The movant on a traditional motion for summary judgment has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). If the movant satisfies its initial burden on the issues expressly presented in the motion, then the burden shifts to the nonmovant to present to the trial court any issues or evidence that would preclude a summary judgment. *See Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 510–11 (Tex. 2014).

To decide whether issues of material fact preclude summary judgment, evidence favorable to the non-moving party must be taken as true, every reasonable inference must be indulged in its favor, and any doubts resolved in its favor.

9

*Sandberg v. STMicroelectronics, Inc.*, 600 S.W.3d 511, 521 (Tex. App.—Dallas 2020, pet. denied). The movant must conclusively establish its right to judgment as a matter of law. *See id.* A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005).

**Insurance Policies**

An insured has the initial burden of establishing coverage under the terms of the policy. *JAW The Pointe, L.L.C. v. Lexington Ins. Co.*, 460 S.W.3d 597, 603 (Tex. 2015). To avoid liability, the insurer then has the burden to plead and prove that the loss falls within an exclusion to the policy's coverage. *Id.*; TEX. R. CIV. P. 94 ("Where the suit is on an insurance contract which insures against certain general hazards, but contains other provisions limiting such general liability, the party suing on such contract shall never be required to allege that the loss was not due to a risk or cause coming within any of the exceptions specified in the contract, nor shall the insurer be allowed to raise such issue unless it shall specifically allege that the loss was due to a risk or cause coming within a particular exception to the general liability[.]").

Insurance policies are interpreted under the rules of construction applicable to contracts in general. *See JAW The Pointe, L.L.C.*, 460 S.W.3d at 603; *see also Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 257 (Tex. 2017) (stating Texas

courts construe insurance policies "using ordinary rules of contract interpretation"). The primary goal of contract construction is to effectuate the parties' intent as expressed in the contract. *See JAW The Pointe, L.L.C.*, 460 S.W.3d at 603. Courts "determine the parties' intent through the terms of the policy, giving words and phrases their ordinary meaning, informed by context." *Dillon Gage Inc. of Dallas v. Certain Underwriters at Lloyds Subscribing to Policy No. EE1701590*, 636 S.W.3d 640, 643 (Tex. 2021). "Unless the policy dictates otherwise, [courts] give words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage." *RSUI Indem. Co. v. The Lynd Co.*, 466 S.W.3d 113, 118 (Tex. 2015) (citing *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 126 (Tex. 2010)). To determine a statutory term's common, ordinary meaning, courts "typically look first to their dictionary definitions and then consider the term's usage in other statutes, court decisions, and similar authorities." *Tex. State Bd. of Exam'rs of Marriage and Fam. Therapists v. Tex. Med. Ass'n*, 511 S.W.3d 28, 35 (Tex. 2017).

If we determine that only one party's interpretation of the insurance policy is reasonable, then the policy is unambiguous, and the reasonable interpretation should be adopted. *Nassar*, 508 S.W.3d at 258. If both interpretations are reasonable, then the policy is ambiguous. *Id.* ("A policy is ambiguous if it is genuinely subject to more than one meaning after applying the pertinent rules of contract

11

interpretation."). In that event, "we must resolve the uncertainty by adopting the construction that most favors the insured," and because we are construing a limitation on coverage, we must do so "even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent." *RSUI*, 466 S.W.3d at 118 (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991)); *see also Gilbert Tex. Const., L.P.*, 327 S.W.3d at 133 ("Terms in insurance policies that are subject to more than one reasonable construction are interpreted in favor of coverage.").

## Discussion

Westlake and the Insurers moved for summary judgment based on their competing interpretations of the Berkley Policy. In its first issue, Westlake argues the trial court erred by granting summary in the Insurers' favor because (1) Westlake's loss is covered by the Berkley Policy's Computer Fraud Clause, and (2) Section D.1.c of the Berkley Policy does not bar coverage because Tinkle is not Westlake's "authorized representative."

Assuming without deciding that Westlake met its burden of proving that its loss is covered under the Berkley Policy's Computer Fraud Clause, we conclude that the Insurers carried their burden to prove that coverage is excluded under the Policy. Once an insured meets its burden to establish that its loss is covered under the relevant insurance policy, the burden shifts to the insurer to prove that the loss falls

12

within an exclusion to the policy's coverage. *See JAW The Pointe, L.L.C.*, 460 S.W.3d at 603. The Insurers argue that Tinkle is Westlake's "authorized representative" and thus, whether or not the loss originated from "Computer Fraud," Westlake's loss is excluded from coverage based on Section D.1.c of the Berkley Policy, which excludes coverage for "Acts Of Employees, Managers, Directors, Trustees Or Representatives."

## A.    Definition of "Authorized Representative"

Section D.1.c of the Berkley Policy bars coverage for losses "resulting from 'theft' or any other dishonest act committed by any of [Westlake's] 'employees', 'managers', directors, trustees or authorized representatives." The parties do not dispute that Tinkle is not Westlake's employee, manager, director, or trustee, or that the losses "result[ed] from 'theft' or any other dishonest act." Thus, the only question presented is whether Tinkle was Westlake's "authorized representative" during the relevant time period.

The Insurers argue that the term "authorized representative" refers to someone who has permission to act on behalf of another. They argue that the summary judgment evidence conclusively established that Westlake authorized Tinkle to act on its behalf in placing orders for shipping supplies and managing Westlake's inventory.

13

Westlake argues that the term "authorized representative" "has a meaning similar (if not identical) to 'agent,'" and thus, to prevail on summary judgment, the Insurers had to establish that, as a matter of law, "Tinkle was entitled to act essentially as Westlake's agent." According to Westlake, "an agent is one who is empowered to act on the principal's behalf." Westlake argues that the Insurers were not entitled to summary judgment because the evidence established that Tinkle was simply Westlake's vendor, not its agent or authorized representative.

The phrase "authorized representative" is not defined in the Berkley Policy. Thus, we must look at the phrase's "ordinary and generally accepted meaning." *See RSUI Indem. Co.*, 466 S.W.3d at 118 ("Unless the policy dictates otherwise, [courts] give words and phrases their ordinary and generally accepted meaning, reading them in context and in light of the rules of grammar and common usage."). In determining the common and ordinary meaning of a term, courts typically look for the term's dictionary definition. *See Tex. State Bd. of Exam'rs of Marriage and Fam. Therapists*, 511 S.W.3d at 35 (stating courts typically look first to term's dictionary definition to determine term's common, ordinary meaning).

The word "authorized" is defined as "having official permission to do something" and being "endowed with authority." *See Authorized*, Cambridge.org, https://dictionary.cambridge.org/dictionary/english/authorized (last visited May 22, 2023) (defining authorized as "having official permission to do something or for

14

something to happen"); *Authorized*, https://www.merriam-webster.com/dictionary/authorized (last visited May 22, 2023) (defining authorized as "endowed with authority").[3] The word "representative" is defined as "someone who speaks or does something officially for another person or group of people" and "one that represents" another. *See Representative*, Cambridge.org, https://dictionary.cambridge.org/us/dictionary/english/representative (last visited May 22, 2023) (defining representative as "someone who speaks or does something officially for another person or group of people"); *Representative*, https://www.merriam-webster.com/dictionary/representative (last visited May 22, 2023) (defining representative as "one that represents another or others," "one that represents another as agent, deputy, substitute, or delegate usually being invested with the authority of the principal," and "one that represents a business organization"); *Represent*, https://www.merriam-webster.com/dictionary/represents (defining represent as "to take the place of in some respect").

Given these dictionary definitions, the phrase "authorized representative" can be commonly understood to mean someone who has permission to speak or act for another, or someone who is empowered to act on another's behalf. Nothing in the

---

[3] *See also Authorize*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/authorize#legalDictionary/authorize (last visited May 22, 2023) (defining authorize as "to give permission to" and "to give authority to act to").

Berkley Policy indicates that the phrase "authorized representative" was intended to have a technical or legal definition. To the extent Westlake attempts to augment the definition of "authorized representative" to encompass a legal or technical definition of agent, such an interpretation is inconsistent with the commonly understood meaning of the term and is thus unreasonable.[4]

## B.    Tinkle is Westlake's Authorized Representative

Based on the plain meaning of "authorized representative," the Insurers were entitled to summary judgment if they conclusively established that Tinkle had permission to or was otherwise empowered to act on Westlake's behalf. As part of its summary judgment evidence, the Insurers submitted deposition testimony from Westlake's Corporate Representative Christopher Anderson ("Anderson"), Westlake's interrogatory responses, and a letter from Westlake responding to

---

[4]    We further note that Westlake's agency arguments appear to be based on the legal principle of agency, as opposed to the commonly understood meaning of the term. *Compare Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 589 (Tex. 2017), *with Agent*, https://www.merriam-webster.com/dictionary/agent (last visited May 22, 2023) (defining agent as "one who is authorized to act for or in the place of another"). This principle is typically employed to determine whether one party (the alleged principal) is liable for the conduct of another (the alleged agent) and whether one party's contacts with a forum can be imputed to another for purposes of establishing jurisdiction. *See Gaines v. Kelly*, 235 S.W.3d 179, 182 (Tex. 2007) (stating principal is liable for acts of another acting as its agent only when agent has actual or apparent authority to do those acts); *F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680, 686 (Tex. 2007) (stating doctrine of vicarious liability makes principal liable for his agent's conduct); *Stocksy United v. Morris*, 592 S.W.3d 538, 547 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("Under Texas law, an agency-based theory of imputed contacts may serve as the basis for the exercise of personal jurisdiction over a foreign defendant.").

Berkley's questions about Westlake's loss prepared as part of the claims process. Relying on these exhibits, the Insurers argue that "Westlake admit[ted] that Tinkle was its 'authorized representative' because Westlake admit[ted] that it empowered [Tinkle] to act on its behalf."

Anderson testified that "Westlake gave John Tinkle the responsibility to manage how many supplies we needed at a given time." When asked why Westlake trusted Tinkle to "order bags on [Westlake's] behalf," Anderson explained that Westlake believed it to be "his forte" and that Tinkle had also served in a similar role for other companies. According to Anderson, Westlake did not have an independent system in place to "ensure that Westlake was receiving the inventory" Tinkle ordered. Rather, Westlake "outsourced that to Mr. Tinkle. . .[a]nd [Westlake] relied on him to ensure [it] had enough supplies in place when [it] needed them." As a result of Tinkle's fraud, Westlake now "manages [its] own inventory supplies."

In response to the Insurers' interrogatories, Westlake responded that "John Tinkle ordered the bags and shipping supplies for each packaging warehouse as he determined to be necessary." Westlake also stated that TMI "had authority for calculating how many bags Westlake needed at any given time" and that "TMI ordered additional bags and shipping supplies when it believed the bags and shipping supplies on hand at the packaging warehouses needed to be replenished." In a letter Westlake sent to Berkley as part of the claims process, Westlake stated that, because

17

"TMI maintained bag and shipping supply levels" at Westlake's facilities, "[n]o approval process existed" for those orders after March 2010.

Anderson's testimony, Westlake's interrogatory responses, and its letter to Berkley demonstrate that Westlake authorized Tinkle to manage its shipping supplies, to order additional shipping bags for Westlake, and to ensure that Westlake received the ordered inventory. *See City of Keller*, 168 S.W.3d at 816 (stating matter is conclusively established if reasonable people could not differ as to conclusion to be drawn from evidence). Westlake does not dispute that Tinkle was authorized to act on its behalf in a limited capacity. In its opening brief, Westlake asserts that "the question for adjudication is whether a vendor is an 'authorized representative' when the *scope of his authorization* is to monitor his customer's inventory and suggest purchases and does not include making payments." (Emphasis added). Thus, at a minimum, Westlake does not dispute that it authorized Tinkle to "monitor" Westlake's "inventory and suggest purchases." Rather, Westlake argues that the evidence is insufficient to establish that Tinkle was its "authorized representative" because an "authorized representative" is akin to an agent and therefore the term requires more than managing supplies and suggesting purchases, such as the ability to make payments for the shipping supplies using Westlake's funds.[5] But the plain

---

[5]     In its reply brief, Westlake argues that although it "has admitted the details of its relationship with Tinkle. . .those details plainly do not rise to the level of 'agency.'"

language of the Berkley Policy does not support this technical or legal definition. The plain terms of Section D.1.c. only require evidence that Tinkle had permission to or was otherwise empowered to act on Westlake's behalf, because that is the plain and ordinary meaning of the phrase "authorized representative."

The only remaining question is whether Westlake presented some evidence raising a question of material fact precluding summary judgment on this issue. Citing to the affidavit of David Bourgeois ("Bourgeois"), Westlake's Director of Supply Chain from 2007 to 2016, and the parties' joint stipulation of facts, Westlake argues that the summary judgment evidence establishes that "Tinkle was merely a vendor who could not submit an invoice for payment without approval."

In their joint stipulation of facts, the parties stipulated:

- TMI served as a vendor to Westlake from 2007 until October 23, 2014, and during that time sold to Westlake various supplies used in the exportation of Westlake's polyethylene ('PE') and polyvinyl chloride ('PVC') products.

- Tinkle and TMI were authorized by Westlake to ship plastic shipping bags and related supplies to Packwell for use by Packwell in bagging Westlake's PE and PVC for export.

- During the period of time from 2007 through 2014 that Tinkle perpetrated the fraud referenced in the Grand Jury Indictment, Westlake's approval authority for polyethylene vendor invoices was as follows:

  - Logistics Manager – up to $10,000;

  - Director - Supply Chain – up to $25,000;

19

- Senior Vice President – Polyethylene – up to $100,000; and

- Chief Executive Officer – above $100,000.

Westlake also submitted Bourgeois' affidavit as part of its summary judgment evidence to explain Tinkle's role in more detail. In his affidavit, Bourgeois testified that "[s]hipping bags and related supplies were purchased from TMI either based upon requests from Westlake or when Tinkle suggested additional bags were needed by Westlake." According to Bourgeois, "Tinkle normally submitted a 'Sales Confirmation' form noting what was to be ordered which was then submitted to Westlake for approval," and he later "submit[ted] invoices to Westlake for payment, along with supporting documentation for those invoices." Bourgeois stated that "Tinkle was not appointed to represent or serve as the agent of Westlake," nor was Tinkle "authorized by Westlake to act on Westlake's behalf in dealing with others." According to Bourgeois, Tinkle was "nothing more than a vendor" who "did not have the authority to possess or disburse funds on behalf of Westlake."

Bourgeois' testimony that Tinkle was not authorized to possess or disburse funds or that Tinkle was "not appointed to represent or serve as the agent of Westlake" with respect to others is inconsequential because, as we have concluded, the plain and ordinary meaning of the term "authorized representative" in the Berkley Policy does not require such findings.

20

Moreover, even if Bourgeois' testimony that "[s]hipping bags and related supplies were purchased from TMI[,] either based upon requests from Westlake or when Tinkle suggested additional bags were needed by Westlake[,]" contradicted Anderson's testimony that Tinkle was authorized to order shipping bags on Westlake's behalf, and Westlake's interrogatory responses that Tinkle and TMI ordered bags and shipping supplies for Westlake when they believed it was warranted, Bourgeois' testimony does not contradict Anderson's testimony that Westlake, who currently "manages [its] own inventory supplies," "outsourced" that responsibility to Tinkle and authorized him to order shipping bags and supplies for Westlake and to ensure Westlake received the ordered inventory. As the Insurers argue, that Tinkle may have suggested quantities of shipping bags to order does not mean that Tinkle did not place those orders on Westlake's behalf; nor does Bourgeois' testimony dispute that Westlake relied on Tinkle to ensure Westlake received the bags Tinkle ordered.

Based on the plain meaning of "authorized representative," the Insurers had to conclusively establish that Tinkle had permission to, or was otherwise empowered to, act on Westlake's behalf. We conclude that Anderson's uncontradicted testimony that Westlake "outsourced" responsibility to Tinkle to "ensure that Westlake was receiving the [necessary] inventory" is enough to satisfy their burden. *See City of Keller*, 168 S.W.3d at 816 (stating matter is conclusively established if

21

reasonable people could not differ as to conclusion to be drawn from evidence). Thus, even taking Bourgeois' testimony as true and indulging every reasonable inference in Westlake's favor, we conclude that Bourgeois' testimony does not create a question of fact precluding summary judgment with respect to the exclusion clause in Section D.1.c of the Berkley Policy. *See Sandberg*, 600 S.W.3d at 521.

We overrule Westlake's second issue.[6]

## Conclusion

We affirm the trial court's judgment.


Veronica Rivas-Molloy
Justice


Panel consists of Justices Hightower, Rivas-Molloy, and Farris.

---

[6] We need not consider Westlake's first issue because, even if the Computer Fraud Clause applies, Westlake's loss is barred under Section D.1.c. of the Berkley Policy.